[No. F043095. Fifth Dist. Apr. 1, 2005.]

COUNTY SANITATION DISTRICT NO. 2 OF LOS ANGELES COUNTY et al., Plaintiffs, Cross-defendants and Appellants;
CALIFORNIA ASSOCIATION OF SANITATION AGENCIES et al., Plaintiffs and Appellants, v.
COUNTY OF KERN, Defendant, Cross-complainant and Appellant;
KERN COUNTY BOARD OF SUPERVISORS, Defendant and Appellant;
ARVIN-EDISON WATER STORAGE DISTRICT et al., Interveners and Respondents.

1546

1548

1550

COUNSEL

Lewis Brisbois Bisgaard & Smith, Daniel V. Hyde and Paul J. Beck for Plaintiff, Cross-defendant and Appellant County Sanitation District No. 2 of Los Angeles County.

Woodruff, Spradlin & Smart, Thomas L. Woodruff, Tami S. Crosby, Roberta A. Kraus and M. Lois Bobak for Plaintiff, Cross-defendant and Appellant Orange County Sanitation District.

Rockard J. Delgadillo, City Attorney, Christopher M. Westhoff, Assistant City Attorney, and Keith W. Pritsker, Deputy City Attorney, for Plaintiff, Cross-defendant and Appellant City of Los Angeles.

Somach, Simmons & Dunn and Roberta L. Larson for Plaintiff and Appellant California Association of Sanitation Agencies.

Griswold, LaSalle, Cobb, Dowd & Gin, Robert M. Dowd and Raymond L. Carlson for Plaintiff and Appellant Southern California Alliance of Publicly Owned Treatment Works.

Jones & Beardsley, Mark A. Jones; Borton, Petrini & Conron and Roger A. Parkinson for Plaintiff and Appellant Responsible Biosolids Management, Inc.

Bernard C. Barmann, Sr., County Counsel, James H. Thebeau, Deputy County Counsel; Hogan Guiney Dick and Michael M. Hogan for Defendant, Cross-complainant and Appellant and for Defendant and Appellant.

Law Offices of Young Wooldridge, Ernest A. Conant, Scott K. Kuney and Steven M. Torigiani for Intervener and Respondent Arvin-Edison Water Storage District.

McMurtrey, Hartsock & Worth, James A. Worth; and Linda Alvarado for Interveners and Respondents Cawelo Water District and West Kern Water District.

**OPINION**

**DAWSON, J.**—This appeal concerns the validity of an ordinance that restricts the application of sewage sludge on land located within the jurisdiction of Kern County.[1] Sanitation agencies from Southern California[2] appeal adverse rulings from the trial court. The sanitation agencies contend (1) County was required to prepare an environmental impact report (EIR) under the California Environmental Quality Act (CEQA)[3] prior to adopting the ordinance, (2) the ordinance violated the commerce clause as well as other constitutional and statutory provisions, and (3) a biosolids impact fee of $3.37 per ton violated the prohibition in Vehicle Code section 9400.8 against

---

[1] The ordinance was enacted by the Kern County Board of Supervisors, on behalf of the County of Kern (collectively, defendants or County). For purposes of this opinion, "County" refers to the governmental entity and "Kern County" refers to the geographical area.

[2] Plaintiffs, cross-defendants and appellants are County Sanitation District No. 2 of Los Angeles County (CSDLAC), Orange County Sanitation District (OCSD), and the City of Los Angeles (Bureau of Sanitation; CLABS); plaintiffs and appellants are California Association of Sanitation Agencies (CASA), Responsible Biosolids Management, Inc. (RBM), and the Southern California Alliance of Publicly Owned Treatment Works (SCAP).

[3] Public Resources Code section 21000 et seq. All further statutory references are to the Public Resources Code unless otherwise indicated.

local fees for the privilege of using roads. County contests all of these allegations. It contends that the ordinance benefited the Kern County environment and that any potential adverse environmental impacts were too remote and speculative to justify preparing an EIR.

We hold County was required to prepare an EIR under CEQA. This is because CEQA requires the preparation of an EIR whenever substantial evidence supports a fair argument that an ordinance will cause potentially significant adverse environmental impacts. CEQA thus sets a low threshold for the required preparation of an EIR. Here, the evidence in the administrative record establishes a reasonable possibility that the ordinance will have both positive and adverse impacts on the environment in Kern County and other areas of California, principally because alternative methods of disposal must be implemented. The positive effects of a project do not absolve the public agency from the responsibility of preparing an EIR to analyze the potentially significant negative environmental effects of the project, because those negative effects might be reduced through the adoption of feasible alternatives or mitigation measures analyzed in the EIR. Therefore, County was required to prepare an EIR.

We hold also that plaintiffs have failed to show that the ordinance discriminates against interstate commerce. We reject plaintiffs' constitutional and statutory attacks on the validity of the ordinance, except that we hold the biosolids impact fee was invalid to the extent it was a local fee for road use.

We will remand with directions to the trial court to issue a writ of mandate directing County to prepare an EIR for the ordinance, and for further proceedings to determine the extent to which the biosolids impact fee was a fee for road use. Otherwise, the rulings of the trial court in favor of County on plaintiffs' complaint will be affirmed.

County cross-appeals from the trial court's denial of its CEQA cross-claims against the sanitation agencies. We address County's contention that CEQA required those agencies to conduct an environmental examination in connection with certain biosolids disposal contracts they entered into or extended near the time the ordinance in question was enacted. We hold that the agencies' contract activities were within the scope of their program EIR's covering their wastewater treatment projects and, therefore, were "[s]ubsequent activities in the program" that should have been subjected to an examination in accordance with title 14, section 15168 of the California Code of Regulations[4] to determine if further CEQA review was necessary. We

---

[4] In all further citations, title 14, section 15000 et seq. of the California Code of Regulations will be referred to as the Guidelines.

further hold that, as to expired contracts, this question is moot. Therefore, judgment on County's cross-claims will be reversed and the matter remanded to the trial court with directions to (1) conduct further proceedings to make a complete determination of which contracts have expired, (2) enter an order dismissing as moot County's causes of action that are based on contracts that have expired, and (3) issue writs of mandate under the remaining causes of action directing the appropriate sanitation agency to conduct an examination to determine if additional environmental documents must be prepared in connection with the contracts and extensions.

## HISTORICAL BACKGROUND

Sewage sludge is a product of wastewater treatment. The safe and efficient disposal of sludge is a modern and worldwide concern—a by-product of population growth and modernization.[5] Recent decades have witnessed increasing governmental involvement in the effort to safely and efficiently treat sewage and dispose of sewage sludge. In the United States, efforts at regulation have involved the executive, legislative and judicial branches of government at the federal, state and local levels. This historical background briefly describes the process that reduces sewage to sewage sludge and then discusses the disposal and use of that sludge.

■ "Sewage sludge" is defined by federal regulations as the "solid, semi-solid, or liquid residue generated during the treatment of domestic sewage in a treatment works." (40 C.F.R. § 503.9(w) (2005).) More generally, sewage sludge refers to the mud-like deposit originating from sewage and created by the treatment processes used to decontaminate wastewater before it is released into local waterways.[6] Sewage sludge typically consists of water and 2 to 28 percent solids.[7] (68 Fed.Reg. 61084, 61086 (Oct. 24, 2003).) To illustrate, the Joint Water Pollution Control Plant located in Carson, California (Carson Plant) produces sewage sludge by detaining wastewater solids in an anaerobic digester for approximately 18 days. After digestion, the remaining solids are dewatered in a centrifuge that produces a residue that is approximately 25 percent solids. The Carson Plant refers to these residues as

---

[5] European Commission Joint Research Centre, Institute for Environment and Sustainability, Soil and Waste Unit, Organic Contaminants in Sewage Sludge for Agricultural Use (Oct. 18, 2001) <http://europa.eu.int/comm/environment/waste/sludge/organics_in_sludge.pdf> (as of Apr. 1, 2005).

[6] Goldfarb et al., *Unsafe Sewage Sludge or Beneficial Biosolids?: Liability, Planning, and Management Issues Regarding the Land Application of Sewage Treatment Residuals* (1999) 26 B.C. Envtl. Aff. L.Rev. 687, 688 (Goldfarb, *Sewage Sludge*).

[7] Because the percentage of solids in sewage sludge varies, there is no constant for converting the wet weight of sewage sludge to its dry weight. Dry weight is defined by federal regulation to mean the mass reached after drying to essentially 100 percent solids content. (40 C.F.R. § 503.9(h) (2005).)

"biosolids"—a term that is not defined by federal regulation, and the meaning of which varies with the context in which it is used. (Goldfarb, *Sewage Sludge*, *supra*, 26 B.C. Envtl. Aff. L.Rev. at p. 688.) Some use the term to mean sewage sludge that has been stabilized and disinfected for beneficial use. (*Id.*, fn. 6.) To others, the term helps emphasize the material is a recyclable resource with potential beneficial properties. (Goldfarb, *Sewage Sludge*, at p. 688.)

*Scope of Sewage Sludge Production*

*National Production*

The United States Environmental Protection Agency (EPA) recently estimated the annual production of sewage sludge from the 16,000 wastewater treatment plants in the United States at both 7 million tons and 8 million dry metric tons.[8] (Compare 68 Fed.Reg. 68813, 68817 (Dec. 10, 2003) with 68 Fed.Reg. 61086 (Oct. 24, 2003).) In 2003, the EPA estimated that approximately 60 percent of sewage sludge was treated and applied to farmland, 17 percent was buried in landfills, 20 percent was incinerated, and 3 percent was used as landfill or mine reclamation cover. (68 Fed.Reg. 68817 (Dec. 10, 2003).) The land application of sewage sludge occurred on approximately 0.1 percent of the agricultural land in the United States. (68 Fed.Reg. 61086 (Oct. 24, 2003).) Other application sites include forests, strip-mines, reclamation sites, and public spaces like parks, golf courses, and highway median strips. (*Ibid.*)

*California*

CASA estimated that in 1998 California produced approximately 672,330 dry tons of biosolids and approximately 67.8 percent was applied to land, 10.6 percent was composted, 9.1 percent was buried in landfills, 5.6 percent was incinerated, and 6.9 percent was put in onsite and offsite storage.[9]

---

[8] The EPA has estimated the United States production of human sanitary waste, a precursor of sewage sludge, at approximately 150 million wet tons per year. (68 Fed.Reg. 7176, 7180 (Feb. 12, 2003).) This figure can be restated as about 0.518 wet tons per person per year (*ibid.*) or 2.8 pounds per person per day. By comparison, in 1997, the United States annual production of animal waste from cattle, hogs, chickens and turkeys (which includes more than manure) was estimated at 1,365,661,300 tons, or roughly 5 tons for every person in the United States.

[9] State Water Resources Control Board (State Water Board), Draft EIR, General Waste Discharge Requirements for Biosolids Land Application (June 28, 1999) figure 2-2 (State Water Board's 1999 Draft EIR), which was in the administrative record and is available at <http://www.swrcb.ca.gov/programs/biosolids/deir/chapters/ch2.pdf> (as of Apr. 1, 2005).

The EPA estimated that in 2003 California produced 777,480 dry tons of treated sewage sludge.[10] Approximately 50 percent of this sewage sludge was applied to land, 30 percent was put in landfills, 10 percent was transported out of state, 3 percent was incinerated, and the balance was put in long-term storage or treatment or put to other uses.[11]

Conflict between urban and rural interests has caused controversy over the land application of sewage sludge in California. In 1998, approximately 73 percent of land-applied biosolids in California was applied within the geographical jurisdiction of the Regional Water Quality Control Board, Central Valley Region (Central Valley Water Board), a region that generated only 16.7 percent of California's total production. In contrast, the Los Angeles and San Francisco Regions generated 37.9 percent and 14.4 percent, respectively, and received less than 0.1 percent and 1.8 percent, respectively, of the total land-applied biosolids.[12] The proportion of biosolids applied to land in the Central Valley Region has decreased as a result of restrictive ordinances adopted by counties.[13]

*Kern County*

In 1998, approximately one-third of the biosolids applied to land in California was applied in Kern County.[14] In 1999, County estimated that one million wet tons of sewage sludge were applied to approximately 23,594 acres of irrigated agricultural land in Kern County.[15] The acreage, which was distributed among 14 noncontiguous sites, represented approximately 3 percent of the harvested cropland in Kern County.

---

[10] State Water Board, Final Statewide Program EIR, General Waste Discharge Requirements for Biosolids Land Application (June 2004) page 3-3 (State Water Board's 2004 Final PEIR for Biosolids), which is available at <http://www.swrcb.ca.gov/hearings/docs/finalbio_chap3.pdf> (as of Apr. 1, 2005).

[11] State Water Board's 2004 Final PEIR for Biosolids, page 3-4.

[12] State Water Board's 1999 Draft EIR, table 2-2 and figure 2-2.

[13] In 1998, the Counties of Kings, Kern, Fresno, and Riverside did not have ordinances that prohibited the land application of Class B biosolids. (See State Water Board's 2004 Final PEIR for Biosolids, p. 3-8.) By early 2004, these counties had adopted ordinances that prohibited the land application of Class B biosolids and were among the 17 of the 58 counties in California that had some type of ordinance related directly to the land application of biosolids. (*Ibid.*)

[14] State Water Board's 1999 Draft EIR, table 2-1 (Kern County received 148,000 dry tons).

[15] The administrative record contains a document dated September 1, 1999, that estimated the volume of Class B biosolids brought into Kern County at 823,350 wet tons per year. The four largest sources were the City of Los Angeles (273,700), Los Angeles County (214,000), Orange County (130,300) and "Fresno" (85,000).

*Statutory and Regulatory Framework*

*Federal*

Congress enacted the Federal Water Pollution Control Act Amendments of 1972 (Pub.L. No. 92-500 (Oct. 18, 1972) 86 Stat. 896) to restore and maintain the quality of the nation's waters (33 U.S.C.A. § 1251(a)) by addressing various sources of pollution, including municipal sewage. In addition to providing extensive federal grants to finance the construction of local sewage treatment facilities, the 1972 amendments increased the role of the federal government by extending water quality standards to intrastate waters, setting technology-based effluent limitations, and implementing the water quality standards through a discharge permit system.[16] The Clean Water Act reflected the judgment of Congress that the problem of water pollution caused by the discharge of municipal sewage outweighed problems associated with treating the sewage and disposing of the sewage sludge.[17] The federal legislation stimulated the building of sewage treatment facilities which, in turn, significantly increased the national production of sewage sludge. (See *Leather Industries of America, Inc. v. E.P.A.* (D.C. Cir. 1994) 309 U.S. App. D.C. 136 [40 F.3d 392, 394].)

■ The Clean Water Act addressed the problem of sewage sludge disposal in four ways. First, the use or disposal of sewage sludge was subjected to a permitting program (33 U.S.C.A. § 1345(a)–(c)).[18] Second, the EPA was directed to develop comprehensive regulations establishing standards for sewage sludge use and disposal (33 U.S.C.A. § 1345(d)).[19] Third, states were allowed to establish more stringent standards (33 U.S.C.A. § 1345(e)).[20] Fourth, grants were authorized for the conduct of scientific

---

[16] The federal legislation became commonly known as the Clean Water Act (33 U.S.C.A. § 1251 et seq.) as a result of amendments adopted in 1977. (Pub.L. No. 95-217, § 2 (Dec. 27, 1977) 91 Stat. 1566.)

[17] "According to Milton Russell and Michael Gruber, 'Risk Assessment in Environmental Policy-Making,' 236 *Science* 286, 289 (April 17, 1989), 'the removal of pollutants from waste water produces sludge that must be either disposed of on land, incinerated, or dumped at sea. None of these procedures are without risk to human health or the environment.' " (Breyer, Breaking the Vicious Circle: Toward Effective Risk Regulation (1993) p. 97, fn. 111.)

[18] The National Pollutant Discharge Elimination System (NPDES) permitting program set forth in the Clean Water Act regulates point sources of pollution that reach the waters of the United States. (33 U.S.C.A. § 1342.) Congress delegated the authority to issue permits to discharge pollutants under the NPDES to states with approved water quality programs.

[19] The Water Quality Act of 1987 (Pub.L. No. 100-4 (Feb. 4, 1987) 101 Stat. 7) amended the Clean Water Act to require the EPA to identify and set numeric limits for toxic pollutants in sewage sludge and establish management practices for the use and disposal of sewage sludge containing those pollutants. (33 U.S.C.A. § 1345(d)(2).)

[20] Similarly, legislation adopted by the European Union sets minimum standards for the use of sewage sludge in agriculture and also allows member states to impose more

studies, demonstration projects, and public information and education programs concerning the safe and beneficial management of sewage sludge (33 U.S.C.A. § 1345(g)).

■ Eventually, in 1993,[21] the EPA complied with the directive regarding regulations by promulgating Standards for the Use or Disposal of Sewage Sludge (40 C.F.R. § 503 (2005)) (Part 503), which specify that sewage-sludge may be (1) applied to land, (2) placed in a surface disposal site, such as a sewage-sludge-only landfill, (3) burned in a sewage sludge incinerator, or (4) disposed of in a municipal solid waste landfill that complies with the minimum criteria set forth in 40 Code of Federal Regulations part 258. (Part 503, subparts B [land application], C [surface disposal] & E [incineration]; 40 C.F.R. § 503.4 (2005) [disposal in municipal solid waste landfill].)[22]

The land application provisions of subpart B of Part 503 establish concentration ceilings as well as annual and cumulative loading rates for arsenic, cadmium, copper, lead, mercury, nickel, selenium and zinc (40 C.F.R. § 503.13 (2005)); establish management practices for the protection of water quality and public health (40 C.F.R. § 503.14 (2005)); set the standards for the reduction of pathogens[23] and vector attraction[24] (40 C.F.R. § 503.15 (2005)); and include requirements for monitoring (40 C.F.R. § 503.16 (2005)), recordkeeping (40 C.F.R. § 503.17 (2005)), and reporting (40 C.F.R. § 503.18 (2005)).

---

stringent measures. (See Council Directive 86/278/EEC of 12 June 1986, Protection of the Environment, and in Particular of the Soil, When Sewage Sludge Is Used in Agriculture, 1986 Official J. Eur. Coms. (L181), pp. 0006–0012 <http://europa.eu.int/smartapi/cgi/sga_doc?smartapi!celexapi!prod!CELEXnumdoc&lg= EN&nu mdoc=31986L0278&model=guichett> [as of Apr. 1, 2005].) The Web site maintained by the European Union that summarizes the legislation is <http://europa.eu.int/scadplus/leg/en/lvb/l28088.htm> (as of Apr. 1, 2005).

[21] The history of the EPA's regulation of sewage sludge prior to the final adoption of Part 503 in 1993 is described in Goldfarb, *Sewage Sludge, supra*, 26 B.C. Envtl.Aff. L.Rev. at pages 697–704. The EPA has described the recent legal history of its regulation of sewage sludge in the Federal Register. (See 68 Fed.Reg. 75533 (Dec. 31, 2003).)

[22] A fifth option, ocean dumping of sewage sludge, was eliminated as a legal disposal option effective December 31, 1991, by the federal Ocean Dumping Ban Act of 1988. (33 U.S.C.A. §§ 1401–1445.) (See *City of New York v. United States EPA* (S.D.N.Y. 1981) 543 F.Supp. 1084 [prior to statutory ban, City of New York and EPA litigated deleterious impacts of ocean dumping versus other methods of disposal].)

[23] Pathogenic organisms cause disease and "include, but are not limited to, certain bacteria, protozoa, viruses, and viable" eggs of parasitic worms (40 C.F.R. § 503.31(f) (2005)), such as tapeworms, whipworms, roundworms, and hookworms.

[24] Vectors are rodents, flies, mosquitoes, or other organisms capable of transporting infectious agents; vector attraction refers to the characteristic of sewage sludge that attracts these carriers. (See 40 C.F.R. § 503.31(k) (2005).)

■ Pathogen reduction standards contained in Part 503 are used to differentiate between Class A sewage sludge and Class B sewage sludge. (See 40 C.F.R. § 503.32 (2005).) While Class A sewage sludge is sufficiently treated to essentially eliminate pathogens, Class B sewage sludge is treated only to substantially reduce them. As a result, the requirements for land application of Class B sewage sludge are more stringent than the requirements imposed on Class A sewage sludge.

At the time of their adoption, the EPA stated it was confident the regulations in Part 503 adequately protected the environment and public health from all reasonably anticipated adverse effects. (58 Fed.Reg. 9248, 9249 (Feb. 19, 1993).) Nevertheless, Part 503 has been described as "quite controversial."[25] Citizens and environmental organizations have questioned the adequacy of the chemical and pathogen standards contained in Part 503.[26] As a result of these concerns and the requirement in the Clean Water Act that the sewage sludge regulations be reviewed every two years, the EPA commissioned the National Research Council (NRC) of the National Academy of Sciences to independently review the scientific basis of the regulations governing the land application of sewage sludge.[27]

In July 2002, the NRC published its report—Biosolids Applied to Land: Advancing Standards and Practices—and made the following overarching findings: "There is no documented scientific evidence that the Part 503 rule has failed to protect public health. However, additional scientific work is needed to reduce persistent uncertainty about the potential for adverse human health effects from exposure to biosolids. There have been anecdotal

---

[25] Goldfarb, *Sewage Sludge, supra*, 26 B.C. Envtl. Aff. L.Rev. at page 708; see Comment, *Sewage Sludge and Land Application Practices: Do the Section 503 Standards Guarantee Safe Fertilizer Usage?* (2000) 9 Dick. J. Envtl. L. & P. 147, 169 (asserting EPA failed to account for variability of contaminants in sludge and how combinations of contaminants may affect public health and environment, and failed to foresee problems caused by lackadaisical monitoring and labeling requirements and by the lack of remedies for failure to comply with requirements). Another aspect of the controversy is illustrated by the dispute created when the Agricultural Marketing Service of the United States Department of Agriculture considered allowing the use of sewage sludge in "organic" production. The proposal was based on the view of the federal government that "there is no current scientific evidence that use of sewage sludge in the production of foods presents unacceptable risks to the environment or human health." (65 Fed.Reg. 13514 (Mar. 13, 2000).) Overwhelming public opposition led to the rejection and replacement of the proposal with a regulation that "prohibit[ed sewage sludge] use in the production" of all organic foods. (*Ibid.* ["275,603 commenters . . . almost universally opposed the use of [sewage sludge] in organic production systems"]; see 7 C.F.R. §§ 205.105(g) & 205.301(f)(2) (2005).)

[26] See EPA, Office of Water, Use and Disposal of Biosolids (Sewage Sludge) (Dec. 2003) <http://www.epa.gov/ost/biosolids/dec03factsheet.html> (as of Apr. 1, 2005).

[27] See EPA, Office of Water, Use and Disposal of Biosolids (Sewage Sludge), *supra*; 33 U.S.C.A. § 1345(d)(2)(C) (two-year review of regulations).

allegations of disease,[28] and many scientific advances have occurred since the Part 503 rule was promulgated. To assure the public and to protect public health, there is a critical need to update the scientific basis of the rule to (1) ensure that the chemical and pathogen standards are supported by current scientific data and risk-assessment methods, (2) demonstrate effective enforcement of the Part 503 rule, and (3) validate the effectiveness of biosolids-management practices." (NRC, Biosolids Applied to Land: Advancing Standards and Practices (July 2002) p. 3 <http://www.epa.gov/waterscience/biosolids/nas/complete.pdf> [as of Apr. 1, 2005].)

In response to the NRC report, the EPA developed a final action plan that established objectives and identified research and regulatory projects designed to strengthen its sewage sludge use and disposal program. (68 Fed.Reg. 75531, 75533 (Dec. 31, 2003); see EPA, Office of Water, Use and Disposal of Biosolids (Sewage Sludge), *supra.*) As an example of one project, the EPA intends to conduct an incident-tracking workshop to obtain input on developing a program focused on individuals who have received medical attention and suspect that they may have been affected by sewage sludge application practices, and to thereby isolate the causes of any health problems. (68 Fed.Reg. 75535 (Dec. 31, 2003).) As of the date of this opinion, the implementation of the final action plan is an ongoing process, and some of the activities have not been commenced. (See EPA, Office of Water, Use and Disposal of Biosolids (Sewage Sludge), *supra.*)

*California*

■ In response to Congress's delegation of authority to the states to issue NPDES permits (see fn. 18, *ante*), the California Legislature amended the Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.) to require the State Water Board and its regional counterparts to issue discharge permits that ensure compliance with the Clean Water Act. (See Wat. Code, § 13370 et seq.) As a result, on May 14, 1973, California became the first

---

[28] The anecdotal allegations of which the EPA is aware (but unconvinced) include (1) over 350 claims of adverse effects collected by the Cornell Waste Management Institute, (2) the deaths of Shayne Conner, Tony Behun, and Daniel Pennock, and (3) the deaths of 300 dairy cattle on a farm near Augusta, Georgia that resulted in a $550,000 jury verdict in a state court action. (G. Tracy Mehan, III, EPA, letter to Joseph Mendelson, III, Center for Food Safety, and Thomas Alan Linzey, Community Environmental Legal Defense Fund, Inc., Dec. 22, 2003, pp. 3, 5–7 [denying petition to stop land application of sewage sludge] <http://www.centerforfoodsafety.org/pubs/SewageSludgePetitionResponse12-22-03.pdf> [as of Apr. 1, 2005].) The claims related to the dairy cattle also are described in the administrative record and in *Boyce v. Augusta-Richmond County* (S.D.Ga. 2000) 111 F.Supp.2d 1363. The medical examiner's autopsy report for Shayne Conner is in the administrative record and it concludes the cause of his death is unknown.

state to be approved by the EPA to administer the NPDES permit program. (See 54 Fed.Reg. 40664 (Oct. 3, 1989); *WaterKeepers Northern California v. State Water Resources Control Bd.* (2002) 102 Cal.App.4th 1448, 1452 [126 Cal.Rptr.2d 389].)

In August 1993, as part of administering the NPDES permit program, the Central Valley Water Board adopted a general order setting the waste discharge requirements (WDR) for the use of sewage sludge as a soil amendment and approved an initial study and negative declaration in connection with that general order. Under the general order, a person wanting to apply biosolids to agricultural land could file with the Central Valley Water Board a notice of intent to comply with the general order, a filing fee, and a preapplication report and, upon receiving an approval letter from the Central Valley Water Board, could begin to apply biosolids subject to the terms and conditions in the general order. Projects using sewage sludge that did not fit the conditions contained in the general order were required to apply for individual WDR's.

On May 26, 1995, the Central Valley Water Board modified its earlier general order by adopting Order No. 95-140 titled "Waste Discharge Requirements General Order For Reuse of Biosolids and Septage on Agricultural, Forest, and Reclamation Sites." The order set minimum standards for the use of biosolids, including Class B sewage sludge, as a soil amendment.

 Also in 1995, the California Legislature specifically addressed the land application of sewage sludge by adopting Water Code section 13274 (Stats. 1995, ch. 613, § 1, p. 4590), which required the State Water Board or the regional boards to prescribe general WDR's for the discharge of treated sewage sludge used as a soil amendment. (Wat. Code, § 13274, subds. (a) & (b).) Water Code section 13274 also states that it does not restrict the authority of local government agencies to regulate the application of sewage sludge to land within their jurisdiction. (*Id.*, subd. (i).)

 Other California legislation affecting the disposal and use of sewage sludge is the California Integrated Waste Management Act of 1989 (Pub. Resources Code, § 40000 et seq., also known as Assem. Bill No. 939 (1989–1990 Reg. Sess.); see Stats. 1989, ch. 1095, § 22, p. 3812), which requires the use of recycling and source reduction to reduce the amount of solid waste going into landfills. (§ 41780.) More specifically, counties were required to adopt integrated waste management plans that described how 25 percent of the solid waste[29] stream would be recycled, reduced or composted

---

[29] The California Integrated Waste Management Act of 1989 defines "solid waste" to include "dewatered, treated, or chemically fixed sewage sludge [that] is not hazardous waste, manure, vegetable or animal solid . . . ." (§ 40191, subd. (a).)

by 1995 and how 50 percent would be achieved by 2000. (See § 41780; *Kern County Farm Bureau v. County of Kern* (1993) 19 Cal.App.4th 1416, 1419, fn. 2 [23 Cal.Rptr.2d 910].) This legislation caused sewage sludge to be diverted from disposal in landfills in favor of recycling it as a fertilizer applied to agricultural land.[30] For example, in 1995 the City of Oxnard purchased 1,280 acres in Kern County for $1,174,000 as part of a program to apply its sewage sludge to agricultural land and thus reduce its use of landfills.

By 2000, several of the nine regional boards had issued WDR's for the use of biosolids as a soil amendment. To provide a single regulatory framework for the land application of treated sewage sludge in California, in August 2000, the State Water Board issued Water Quality Order No. 2000-10-DWQ, entitled "General Waste Discharge Requirements for the Discharge of Biosolids to Land for Use as a Soil Amendment in Agricultural, Silvicultural, Horticultural, and Land Reclamation Activities" (General Order 2000-10).[31] General Order 2000-10 also was intended to comply with the directive in Water Code section 13274 and streamline the permitting process. The State Water Board's final program EIR relating to General Order 2000-10 was approved on June 30, 2000, and it is part of the appellate record as a result of the superior court granting a request for judicial notice. General Order 2000-10 allowed Class B biosolids to be applied to agricultural land subject to numerous conditions, including site, crop, and harvesting restrictions.

The State Water Board's approval of General Order 2000-10 and certification of the final program EIR was vacated as a result of a CEQA lawsuit brought by County. (*County of Kern v. State Water Resources Control Board* (Jan. 13, 2003, C039485) [nonpub. opn.].)[32] The Third Appellate District held the EIR was defective because it did not evaluate, as alternatives to General Order 2000-10, either a requirement that sewage sludge be treated to Class A standards before application as a soil amendment or a prohibition on the use of treated sewage sludge where fruits and vegetables are grown.

---

[30] According to one set of estimates, the portion of California's annual sewage sludge production disposed of in landfills was 60.2 percent in 1988, 43.3 percent in 1991, 9.1 percent in 1998, and 30 percent in 2003. (State Water Board's 1999 Draft EIR, table 2-2 & fig. 2-2; State Water Board's 2004 Final PEIR for Biosolids, p. 3-4.)

[31] General Order 2000-10 is available on the State Water Board's Web site. (See <http://www.swrcb.ca.gov/resdec/wqorders/2000/wqo2000-10.doc> [as of Apr. 1, 2005].)

[32] County referred to the Third Appellate District's unpublished decision in its reply brief and cited a statement made by the State Water Board in an appellate brief it filed in that case. Our reference to this unpublished opinion as part of a factual narrative of the historical development of California's regulation of sewage sludge is not a citation or reliance upon that opinion as legal authority for purposes of California Rules of Court, rule 976.

To comply with that decision, the State Water Board's 2004 Final PEIR for Biosolids considered, but rejected, the two alternatives specified by the Third Appellate District. Based on that final EIR, the State Water Board adopted Water Quality Order No. 2004-0012 on July 22, 2004 (General Order 2004-0012).[33] General Order 2004-0012 allows Class B biosolids to be applied to agricultural land subject to numerous conditions, including site and crop restrictions.

### Kern County

County first attempted to regulate the application of sewage sludge to agricultural land within its jurisdiction in August 1998, when it adopted Ordinance No. G-6528, an interim urgency ordinance which became operative on September 1, 1998, and was repealed effective December 31, 1999. Ordinance No. G-6528 allowed the application of Class A and Class B sewage sludge in Kern County by any person who obtained a permit from the County Environmental Health Services Department, paid a $7,250 application fee, and observed specified management practices, site restrictions and other requirements.

On October 19, 1999, the Kern County Board of Supervisors adopted Ordinance No. G-6638 (Ordinance G-6638) to substitute a new chapter 8.05 into the Kern County Ordinance Code. Ordinance G-6638 provided for two regulatory stages. The first stage, which lasted three years, allowed the application of Class B sewage sludge on sites that had already been approved, but precluded the approval of any new sites. The second stage was scheduled to become effective on January 1, 2003, and allowed only exceptional quality (EQ) sewage sludge[34] to be applied to land in Kern County.

Ordinance G-6638 is the subject of this appeal and its pertinent provisions are set forth, *post*, in Facts and Proceedings.

In late 2002, County adopted Ordinance No. 6931, which amended chapter 8.05 of the county code to impose a permitting requirement on the application of EQ biosolids to land within the unincorporated area of Kern County, and found that the project was exempt from CEQA pursuant to section 15308 of the Guidelines, which concerns actions by regulatory agencies to protect the environment. This appeal does not directly involve the 2002 amendment.

---

[33] General Order 2004-0012 is available at <http://www.swrcb.ca.gov/resdec/wqorders/2004/wqo/wqo2004-0012.pdf> (as of Apr. 1, 2005).

[34] EQ sewage sludge must meet one of the Class A pathogen reduction alternatives set forth in 40 Code of Federal Regulations part 503.32(a) (2005); the more stringent pollutant concentration standards set forth in 40 Code of Federal Regulations part 503.13(b)(3) (2005); and a level of vector attraction reduction required by 40 Code of Federal Regulations part 503.33 (2005).

*Overview of California Cases Involving Land Application of Sewage Sludge*

The application of sewage sludge to land has been the topic of litigation before this and other appellate courts located in California.

This court considered the application of CEQA to Kings County's sewage sludge ordinance in *Magan v. County of Kings* (2002) 105 Cal.App.4th 468 [129 Cal.Rptr.2d 344]. In that case, the Kings County Board of Supervisors determined that its ordinance regulating the application of sewage sludge to land in Kings County was categorically exempt from review under CEQA, and this court upheld that determination. (105 Cal.App.4th at pp. 476–477.)

As described earlier, in January 2003, the Third Appellate District considered County's challenge to the adequacy of the EIR the State Water Board prepared in connection with its adoption of General Order 2000-10. (*County of Kern v. State Water Resources Control Board, supra,* C039485 [nonpub. opn.].) That litigation led to the certification of the State Water Board's 2004 Final PEIR for Biosolids and the adoption of General Order 2004-0012.

In *U.S. v. Cooper* (9th Cir. 1999) 173 F.3d 1192, the defendant sludge hauler directly applied sludge to a local farm instead of taking the sludge to a composting site first as required by a NPDES permit issued to the City of San Diego by the regional water quality board. The sludge hauler was convicted under the Clean Water Act of knowingly violating conditions imposed by the permit on the disposal of sewage sludge. The Ninth Circuit Court of Appeals upheld the conviction and ruled, among other things, that Part 503—which encouraged the direct land application of sewage sludge, but did not require state and local governments to allow it—did not preempt the conditions in the permit that the sludge hauler violated. (*U.S. v. Cooper, supra,* at pp. 1200–1201.)

In addition to the foregoing appellate cases, the briefing in this appeal mentions other cases before state and federal trial courts concerning County's efforts to regulate the land application of sewage sludge. County contends that Shaen Magan brought two state court actions challenging Ordinance G-6638 and that the judgments entered in County's favor in those actions are now final. In addition, County represents that another state court action brought against it has been stayed by the Tulare County Superior Court pending the resolution of this appeal, and that CASA and others have sued it in a federal action attacking an amended version of the ordinance.

## FACTS AND PROCEEDINGS

In connection with its consideration and adoption of an ordinance regulating the land application of biosolids within its jurisdiction, County undertook a process that involved the public and produced an administrative record of over 25,000 pages.

In 1997, County established a Biosolids Ordinance Advisory Committee to assist in the preparation of a draft ordinance. The committee included representatives from farming organizations, sludge generators and applicators, environmental groups, County staff and other interested parties. In all, the committee held five public meetings between November 20, 1997, and April 29, 1999. Expert presentations on the scientific issues involving biosolids were received at two public hearings held by County.

In January 1998, County pursued early consultation with public agencies and interested parties to obtain comments on the potential environmental effect of its proposed form of biosolids ordinance. After revisions to the proposed ordinance, County again sought early consultation in May 1999 in connection with determining whether compliance with CEQA would require preparation of an EIR for the proposed ordinance. After the second consultation period was complete, an initial study was prepared.

On August 10, 1999, an environmental checklist form was completed which found the project—that is, enactment of the ordinance—would not have a significant effect on the environment, and which recommended the preparation of a negative declaration.

County's Planning Department prepared a proposed negative declaration for the biosolids ordinance and published the corresponding notice of availability for public review on August 13, 1999. On October 19, 1999, after the period for public review of the negative declaration expired, County enacted Ordinance G-6638 and adopted the negative declaration. Section 3 of Ordinance G-6638 amended chapter 8.05 of the Kern County Ordinance Code (Kern Code) effective January 1, 2000, to provide in part:

## "8.05.010 PURPOSE AND INTENT

"There are numerous unanswered questions about the safety, environmental effect, and propriety of land applying Biosolids or sewage sludge, even when applied in accordance with federal and state regulations. Biosolids may contain heavy metals, pathogenic organisms, chemical pollutants, and synthetic organic compounds, which may pose a risk to public health and the environment if improperly handled. There is a lack of adequate scientific

understanding concerning the risk land applying of Biosolids may pose to land, air and water and to human and animal health. . . . Consequently, in order to promote the general heath, safety and welfare of Kern County and its inhabitants, it is the intent of this chapter that the land application of Biosolids shall be prohibited in the unincorporated area of Kern County.

"The County recognizes there are existing permitted sites involved in the land application of Biosolids. Consistent with the protection of private property rights under the United States and California constitutions, this ordinance contains a three year amortization period to permit the orderly discontinuation of the land application of Biosolids by January 1, 2003.

"The County also recognizes that Exceptional Quality Biosolids, as defined in this chapter, are considered by the U.S. Environmental Protection Agency to be a product . . . that can be applied as freely as any other fertilizer or soil amendment to any type of land. Therefore, the provisions of this chapter do not apply to Exceptional Quality Biosolids unless specifically stated herein. Further, the provisions of this chapter do not apply to Compost, as defined herein, manufactured from Biosolids at composting facilities that are otherwise regulated by the County through Solid Waste and Conditional Use Permits.

## "8.05.020 DEFINITIONS

"A. **Agency** means an authorized representative of the Environmental Health Services Department of the County. . . . [¶] . . . [¶]

"E. **Biosolids** are treated solid, semi-solid or liquid residues generated during the treatment of sewage in a wastewater treatment facility that meet [certain federal requirements for pathogen reduction, vector attraction reduction and pollutant concentrations]. . . . Biosolids as used in this chapter excludes Biosolids products that are in a bag or container packaged for routine retail sales through regular retail outlets which are primarily used for landscaping.

"F. **Biosolids Impact Fee** means the fee per ton of Biosolids charged to Biosolids applicators for mitigating the impacts to the Kern County infrastructure shown to be caused by the transport of Biosolids. Permitees which can establish the lack of impact on County infrastructure shall be exempt from payment of the fee. [¶] . . . [¶]

"H. **Class A Biosolids** are Biosolids that meet the pathogen reduction requirements in 40 CFR 503.32[(a)[35]] and contain constituents in concentrations not exceeding the concentrations listed in 40 CFR 503.13, Table 1 or Table 3.

"I. **Class B Biosolids** are Biosolids that meet the pathogen reduction requirements in 40 CFR 503.32(b).

"J. **Compost** means the product resulting from the controlled biological decomposition of organic materials which may include Biosolids. Facilities where compost is produced are required to obtain Solid Waste Facilities and Conditional Use Permits as a condition of operation. Compost products are required to meet or exceed product quality criteria as established by the California Integrated Waste Management Board. [¶] . . . [¶]

"M. **Exceptional Quality Biosolids** are Class A Biosolids that meet the pollutant concentrations in 40 CFR 503.13, Table 3 and have achieved a level of vector attraction reduction required by 40 CFR 503.33. Additionally, Class A Biosolids must meet both the fecal coliform and Salmonella sp. bacteria limits contained in alternatives 1 through 6 of 40 CFR 503.32(a) to be Exceptional Quality. For the purposes of this chapter, Exceptional Quality Biosolids are in bulk form and shall not include Compost which meets or exceeds Exceptional Quality criteria. [¶] . . . [¶]

"P. **Land Application** means the placement of Biosolids on agricultural land at a predetermined agronomic rate to support vegetative growth. For purposes of this chapter, placement includes the spraying or spreading of Biosolids onto the land surface, the injection of Biosolids below the surface, or the incorporation of Biosolids into the soil. [¶] . . . [¶]

"R. **Permit** means a Land Application Permit issued by the Agency jointly to an Applier and all POTWs or other generators who supply Biosolids to the Applier. Such permit authorizes the Land Application of Biosolids in the County. Permits are not transferable to other parties without the prior approval of the Agency as provided in Section 8.05.040.R. [¶] . . . [¶]

"T. **POTW** means publicly or privately owned treatment works that process wastewater and generate Biosolids. . . . [¶] . . . [¶]

---

[35] This reference was probably intended to be limited to subsection (a), which states the pathogen reduction requirements for sewage sludge to be classified Class A.

## "8.05.030 GENERAL REQUIREMENTS

"A. Prior to commencing any Land Application activities under this chapter, the Applier shall obtain a Permit and pay all applicable fees. Only Sites with an Existing Permit shall be eligible for issuance of a Permit under this chapter. [¶] . . . [¶]

"H. Biosolids Impact Fee.

"1. There is levied by the County of Kern a fee of $3.37 per ton for each ton of Biosolids land applied within the county. The amount of the fee shall be calculated based on the monthly activity report as required by section 8.05.070(I) and is to be remitted to the Agency along with the filing of the monthly activity report. Permitees are subject to enforcement action, including revocation of the Permit, for non-payment. Where the Permitee can demonstrate the land application of Biosolids does not have an impact on County infrastructure or roads, the Agency may waive this fee.

"2. Permitees, either directly or through the wastewater treatment plant generating the Biosolids to be applied on the Permitee's property, which separately contract with the County or are determined to provide a reciprocal benefit, as determined by the Board of Supervisors, shall be exempt from this fee.

"3. Funds generated by this impact fee and other permit fees may be available to fund the following uses: Expenses associated with the inspection of properties within the County which have permits for the land application of Biosolids; development and operation of a GIS tracking system for all Biosolids land applied within the County so that there is an accurate data base containing this information; technical studies and pilot projects which provide additional data on Biosolids land application; correction of any infrastructure deficiencies directly associated with the hauling of Biosolids; and, the cost of public outreach and education programs to ensure that the standards expressed within this ordinance and contained in the federal guidance for the beneficial use of Biosolids are adhered to. The budget for the expenditure of the Biosolids Mitigation Fund on mitigating the impact of Biosolids land application within the County as set forth above, shall be prepared by the Director of the Resource Management Agency for approval by the Board of Supervisors annually. [¶] . . . [¶]

## "8.05.040 PERMIT APPLICATION

"A. It shall be unlawful for any person to apply Biosolids to land within the unincorporated area of the County without obtaining a Permit from the Agency and being in compliance with the terms and conditions as stated herein.

"B. The application for a Permit shall be filed with the Agency on an application form furnished by the Agency, accompanied by an eight thousand dollar ($8,000) fee. . . . [¶] . . . [¶]

"G. The Agency may deny an application for one (1) or more of the following reasons:

"1. Prior significant non-compliance with local, state or federal regulations or permits related to the land application of biosolids.

"2. Inadequate, incomplete, or inaccurate application information.

"3. The land application proposal would not be in conformance with the applicable requirements of this chapter. [¶] . . . [¶] .

"M. Fees to review and process Permit applications, appeal an action of the Agency, as specified herein, inspect Sites, engage in enforcement activities and compensate for infrastructure impacts shall be established by the Board of Supervisors. [¶] . . . [¶]

## "8.05.050 MANAGEMENT PRACTICES

"A. Transportation, Storage and Land Application of Biosolids shall not degrade the groundwater or surface water.

"B. Discharge of Biosolids to surface waters or surface water drainage courses is prohibited and all Biosolids shall be confined to within the boundaries of the Site.

"C. All irrigation tailwater on Sites utilized for Biosolids application shall be maintained on the permitted Site and shall not be allowed to flow on to adjacent properties, either by means of surface or subsurface flows. [¶] . . . [¶]

## "8.05.080 INSPECTION AND ENFORCEMENT

"A. The Agency shall inspect all Sites at least one (1) time per week during the period when Biosolids are being applied and may inspect more frequently or at any time.

"B. The Agency may charge for services not specifically described that are rendered by personnel that are necessary for the enforcement of the provisions of this ordinance. The charge will be calculated on the per-hour fee of

seventy-five ($75.00) dollars as established in Section 8.04.100. Any laboratory analysis will be charged at the Agency's actual costs as charged by a Certified Laboratory retained by Agency for any testing.

"C. Any person violating any of the provisions of this chapter shall be deemed guilty of a misdemeanor.

"D. In addition, any violation of this chapter may be deemed by the Agency to be a public nuisance, and may be abated, or enjoined by the Agency, irrespective of any other remedy herein provided.

**"8.05.090 EFFECTIVE DATE**

"The provisions of this chapter shall expire on December 31, 2002, unless otherwise extended by the board of supervisors."

Section 4 of Ordinance G-6638 replaced the expired version of chapter 8.05 with a new chapter 8.05 scheduled to become effective on January 1, 2003. Provision 8.05.010 was revised slightly but still stated that the chapter did not apply to EQ biosolids or compost. The definitions of EQ biosolids and compost were not changed. The substantive requirements of that new chapter 8.05 stated:

**"8.05.040 BIOSOLIDS PROHIBITED**

"A. It shall be unlawful for any person to land apply Biosolids to property within the unincorporated area of the County. Any Site for which a Permit was issued prior to . . . January 1, 2003 shall discontinue land application of Biosolids upon the effective date of this chapter.[36]

"B. The discharge of Biosolids to surface waters or surface water drainage courses, including wetlands and water ways, is prohibited."

Section 5 of Ordinance G-6638 declared that the provisions of Ordinance G-6638 were severable and that the invalidity of any clause or provision would not affect the validity of the other provisions of the ordinance.

---

[36] All subsequent references to Kern Code provision 8.05.040(A), Ordinance G-6638, are to this version, which was contained in section 4 of Ordinance G-6638 and was scheduled to become effective on January 1, 2003. The substantive requirements of provision 8.05.040(A) were reenacted by the adoption of Ordinance No. G-6931, which repealed Ordinance G-6638. All subsequent references to the "heightened treatment standards" are to those substantive requirements; this term was chosen because the effect of those requirements was that sewage sludge could not be applied to land in the unincorporated areas of Kern County unless the sludge was treated to the higher standards used to define EQ biosolids.

On November 8, 1999, CSDLAC, OCSD, CLABS, SCAP, CASA, and RBM filed a petition for writ of mandate and complaint for injunction and declaratory relief. The first cause of action in the petition alleged County violated CEQA by approving the negative declaration and making findings that Ordinance G-6638 would not have significant impact on the environment. The second cause of action asserted the adoption of Ordinance G-6638 was an invalid exercise of police power and a violation of the commerce clause. The third cause of action alleged the imposition of the biosolids impact fee violated provisions of the California Constitution concerning taxes, as well as the equal protection and due process clauses of the United States and California Constitutions, by unfairly discriminating against vehicles carrying biosolids.[37]

On March 1, 2000, County filed its cross-action against CSDLAC, OCSD and CLABS challenging changes made in their sewage sludge disposal programs. After amendment on June 19, 2000, County's cross-action contained (1) four causes of action alleging CLABS violated CEQA by entering certain contracts and amendments relating to the disposal of biosolids generated at its facilities without performing any environmental review; (2) one cause of action alleging CSDLAC violated CEQA by failing to undertake any environmental review when it and Yakima Company amended and extended their contract for the transportation of sewage sludge from CSDLAC's facilities to Kern County for application on farm land; and (3) five causes of action alleging OCSD violated CEQA by entering biosolids management agreements or options for the purchase of real estate used in connection with the disposal or use of biosolids generated at its facilities without performing any environmental review.

The superior court granted plaintiffs' request that their CEQA cause of action be bifurcated, took all of the CEQA claims under submission on August 30, 2000, and by written ruling entered on November 22, 2000, denied the CEQA claims of all parties.

Approximately a year and a half later, the superior court heard and denied plaintiffs' motions for summary judgment, and granted County's motion for a protective order regarding depositions and written discovery requested by CSDLAC, OCSD and Shaen Magan relating to the remaining non-CEQA causes of action that challenged the validity of County's legislative act of adopting Ordinance G-6638.

---

[37] The theory of discrimination alleged was that vehicles loaded with Class B biosolids should not be singled out, and that all vehicles using the same roads and carrying a load of similar weight caused damage to the roads and thus should be charged the same fee.

On June 3, 2002, the parties agreed to present their cases by trial briefs. After considering the briefs filed by the parties, the superior court entered an order on November 25, 2002, denying the non-CEQA claims alleged in plaintiffs' second and third causes of action. The superior court filed a statement of decision on January 7, 2003, which ruled that (1) Ordinance G-6638 was not an invalid exercise of police power or a violation of the commerce clause and (2) the biosolids impact fee passed constitutional scrutiny because it had a rational basis and was not an illegal general or special tax. On March 10, 2003, judgment was entered in favor of County on all causes of action asserted by plaintiffs and in favor of the cross-defendants on all causes of action asserted by County in its cross-action.

CSDLAC, OCSD, CLABS, CASA, RBM and SCAP timely filed an appeal. County timely filed a notice of appeal from the judgment that denied its cross-action.

## DISCUSSION

Plaintiffs contend County erroneously found that Ordinance G-6638 would not have a significant effect on California's environment and, therefore, County violated CEQA when it approved the negative declaration and adopted Ordinance G-6638. The superior court ruled the approval of the negative declaration was appropriate because there was no "substantial evidence of a fair argument that adoption of this ordinance, which continues to allow application of biosolids but requires [plaintiffs] to upgrade them to protect the environment, would have an adverse impact on the environment."

We hold that the preparation of an EIR was mandatory under the low threshold imposed by the fair argument standard because the administrative record contained sufficient, credible evidence that the heightened treatment standards for the application of sewage sludge to land in the unincorporated areas of Kern County might have a significant adverse effect on California's environment. Furthermore, the possibility that the net overall impact of the ordinance was beneficial did not override the requirement in CEQA for the preparation of an EIR addressing the significant adverse environmental impacts the ordinance may have caused. (Guidelines, § 15063, subd. (b).)

I. *CEQA Standard of Review*

A. *General Principles*

It is well established in CEQA proceedings that (1) the public agency is the finder of fact, (2) the superior court's findings are not binding on the appellate court, and (3) the scope and standard of review applied by

the appellate court to the agency's decision is the same as that applied by the superior court. (See §§ 21168, 21168.5; *Fat v. County of Sacramento* (2002) 97 Cal.App.4th 1270, 1277 [19 Cal.Rptr.2d 402] [county's approval of a negative declaration and conditional use permit reinstated and trial court reversed].)

■ When a CEQA petition challenges action of a public agency that is legislative or quasi-legislative in character, the standard of review contained in section 21168.5 and the procedures for traditional mandamus set forth in Code of Civil Procedure section 1085 are applied. (See *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 566–567 [8 Cal.Rptr.2d 139, 888 P.2d 1268].) Section 21168.5 provides: "In any action or proceeding, other than an action or proceeding under Section 21168, to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."

■ Amendment or adoption of an ordinance is a legislative act subject to review under section 21168.5. (*Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165, 172, fn. 2 [105 Cal.Rptr.2d 214, 19 P.3d 567] [§ 21168.5 applied to CEQA challenge to city ordinance that removed certain properties from register of historic landmarks]; *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68 [118 Cal.Rptr. 34, 529 P.2d 66] [city's adoption of ordinances without CEQA compliance was governed by § 21168.5]; *Fall River Wild Trout Foundation v. County of Shasta* (1999) 70 Cal.App.4th 482, 488 [82 Cal.Rptr.2d 705] [county's amendment of a zoning ordinance reviewed under § 21168.5].) Accordingly, the Kern County Board of Supervisors' adoption of Ordinance G-6638 is reviewable under section 21168.5 for a prejudicial abuse of discretion.

B. *Fair Argument Test*

■ CEQA requires a governmental agency to "prepare, or cause to be prepared by contract, and certify the completion of, an environmental impact report on any project which they propose to carry out or approve that may have a significant effect on the environment." (§ 21100, subd. (a); see Guidelines, § 15064, subd. (a)(1).) Conversely, a negative declaration—rather than an EIR—is appropriate when the administrative record before the

governmental agency does not contain substantial evidence that the project may have a significant effect on the environment. (§ 21080, subd. (c).)

■ When a court reviews an agency's decision to certify a negative declaration, the court must determine whether substantial evidence supports a "fair argument" that the project may have a significant effect on the environment. (See §§ 21080, subds. (c) & (d), 21151; *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231, 864 P.2d 502]; *Stanislaus Audubon Society, Inc. v. County of Stanislaus* (1995) 33 Cal.App.4th 144, 150–151 [39 Cal.Rptr.2d 54] [Ct. App., 5th Dist. voided negative declaration and mandated preparation of EIR].) The determination by an appellate court under the fair argument test involves a question of law decided independent of any ruling by the superior court. (*Stanislaus Audubon Society, Inc.*, at p. 151.) Consequently, "we independently 'review the record and determine whether there is substantial evidence in support of a fair argument [the proposed project] may have a significant environmental impact, while giving [the lead agency] the benefit of a doubt on any legitimate, disputed issues of credibility.'" (*Ibid.*, quoting *Quail Botanical Gardens Foundation, Inc. v. City of Encinitas* (1994) 29 Cal.App.4th 1597, 1603 [35 Cal.Rptr.2d 470]; see § 21151.)

■ California courts, including the Fifth Appellate District, routinely describe the fair argument test as a low threshold requirement for the initial preparation of an EIR that reflects a preference for resolving doubts in favor of environmental review. (See *Stanislaus Audubon Society, Inc. v. County of Stanislaus, supra*, 33 Cal.App.4th at p. 151; *Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1316–1317 [8 Cal.Rptr.2d 473] [Ct. App., 1st Dist., Div. 1]; see also *No Oil, Inc. v. City of Los Angeles, supra*, 13 Cal.3d at p. 84.)

In contrast to this description of the fair argument test, County asserts that "[a]ny reasonable doubts whether substantial evidence exists must be resolved in favor of the agency's decision." This assertion is rejected because (1) it misstates the low threshold of the fair argument test and (2) the case relied upon by County did not actually involve the fair argument test or the approval of a negative declaration. (See *Marin Mun. Water Dist. v. KG Land California Corp.* (1991) 235 Cal.App.3d 1652, 1660 [1 Cal.Rptr.2d 767] [court explicitly stated it was applying the substantial evidence standard to the agency's approval of the EIR].) Where the question is the sufficiency of the evidence to support a fair argument, "deference to the agency's determination is not appropriate . . . ." (*Sierra Club v. County of Sonoma, supra*, 6 Cal.App.4th at pp. 1317–1318.)

■ A logical deduction from the formulation of the fair argument test is that, if substantial evidence establishes a reasonable possibility of a significant environmental impact, then the existence of contrary evidence in the administrative record is not adequate to support a decision to dispense with an EIR. (Guidelines, § 15064, subd. (f)(1); *League for Protection of Oakland's etc. Historic Resources v. City of Oakland* (1997) 52 Cal.App.4th 896, 904–905 [60 Cal.Rptr.2d 821].) The environmental review necessary to complete an EIR prepares the agency to weigh the conflicting substantial evidence on each side of an issue and make its findings of fact.

■ The fair argument test also requires the preparation of an EIR where "there is substantial evidence that any aspect of the project, either individually or cumulatively, may cause a significant effect on the environment, regardless of whether the overall effect of the project is adverse or beneficial . . . ." (Guidelines, § 15063, subd. (b)(1); see *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1996) 42 Cal.App.4th 608, 614–615 [49 Cal.Rptr.2d 494].) In other words, for projects that may cause both beneficial and adverse significant impacts on the environment, preparation of an EIR is required because the consideration of feasible alternatives and mitigation measures might result in changes to the project that decrease its adverse impacts on California's environment. Consequently, the argument that an EIR was unnecessary because the net overall effect of Ordinance G-6638 was beneficial to the environment must fail, regardless of potential environmental benefits, if substantial evidence shows a reasonable possibility of one or more significant adverse environmental impacts.

C. *Definitions Relevant to the Fair Argument Test*

The fair argument test contains several terms that are defined further by CEQA, the Guidelines, or case law.

■ First, the term "substantial evidence" is defined by the Guidelines to mean "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a); see *No Oil, Inc. v. City of Los Angeles, supra,* 13 Cal.3d at p. 75.) CEQA specifically provides that "substantial evidence includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact" (§ 21080, subd. (e)(1)) and excludes "argument, speculation, unsubstantiated opinion or narrative, evidence that is clearly inaccurate or erroneous, or evidence of social or economic impacts that do not contribute to, or are not caused by, physical impacts on the environment." (*Id.,* subd. (e)(2); see Guidelines, § 15384, subd. (a).) Thus, the existence of a public controversy is not a substitute for substantial evidence. (Guidelines, § 15064, subd. (f)(4).)

 Second, a project "may" have a significant effect on the environment if there is a "reasonable possibility" that it will result in a significant impact. (*No Oil, Inc. v. City of Los Angeles, supra,* 13 Cal.3d at p. 83, fn. 16.)

Third, "environment" is defined by CEQA as "the physical conditions [that] exist within the area [that] will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (§ 21060.5.) Section 15360 of the Guidelines explains this definition by providing: "The area involved shall be the area in which significant effects would occur either directly or indirectly as a result of the project. The 'environment' includes both natural and man-made conditions."

Fourth, the phrase "significant effect on the environment" is defined as "a substantial, or potentially substantial, adverse change in the environment." (§ 21068; see Guidelines, § 15382.) "In determining whether an effect will be adverse or beneficial, the lead agency shall consider the views held by members of the public in all areas affected as expressed in the whole record before the lead agency." (Guidelines, § 15064, subd. (c).)

Fifth, the "significance" of an environmental effect requires the evaluation of "direct physical changes in the environment [that] may be caused by the project and reasonably foreseeable indirect physical changes in the environment [that] may be caused by the project." (Guidelines, § 15064, subd. (d); see § 21065.)[38] In this context, "direct" means "caused by and immediately related to the project." (Guidelines, § 15064, subd. (d)(1).) "Indirect" means "not immediately related to the project, but . . . caused indirectly by the project" such as a physical change caused by a direct physical change. (*Id.,* subd. (d)(2).) The test for the strength of the nexus between the project and an indirect physical change is whether "that change is a reasonably foreseeable impact [that] may be caused by the project." (*Id.,* subd. (d)(3).) The "reasonably foreseeable" test excludes physical changes that are speculative or not likely to occur. (*Ibid.*)

Sixth, "effects" and "impacts" are synonymous and include (1) "[d]irect or primary effects [that] are caused by the project and occur at the same time and place" and (2) "[i]ndirect or secondary effects [that] are caused by the project and are later in time or farther removed in distance, but are still reasonably foreseeable." (Guidelines, § 15358, subd. (a).) A common example of an indirect effect is the pollution that results from the growth-inducing effect of a project. (See Guidelines, §§ 15064, subd. (d)(2), 15382.)

---

[38] The Guidelines caution that an ironclad definition of "significant effect" is not possible because the significance of an activity may vary with the setting. (Guidelines, § 15064, subd. (b).)

## II. *An EIR is Required Under the Low Threshold of the Fair Argument Test*

Plaintiffs contend the implementation of Ordinance G-6638 created a reasonable possibility of significant environmental impacts both inside and outside Kern County. Plaintiffs contend these significant impacts included (1) increased vehicle traffic, (2) increased air pollution in the form of vehicle emissions, dust and volatilization of pesticides, (3) degraded water quality from the use of alternative fertilizers, (4) increased burdens on landfills, (5) increased energy and fuel consumption, (6) increased soil erosion, (7) increased use of irrigation water, (8) increased exposure of humans to pathogens, (9) loss of habitat for small animals, and (10) loss of productivity of marginal farmland.

County contends the fair argument test was not met because (1) the relevant environment was approximately 23,594 acres of farmland[39] in Kern County where Class B biosolids were applied and (2) it was not reasonably possible that significant adverse environmental impacts would occur on that farmland. To support its first contention, County asserts that any broader sweep of the ordinance would depend on alternative methods of biosolids disposal chosen by plaintiffs, and that the environmental impacts resulting from those methods were thus too uncertain and speculative for County to evaluate. To support its second contention, County asserts EQ biosolids would serve as an adequate substitute for the Class B biosolids that could no longer be applied by farmers.

CEQA defines the relevant geographical environment as the area where physical conditions will be affected by the proposed project. (§ 21060.5.) Consequently, the project area does not define the relevant environment for purposes of CEQA when a project's environmental effects will be felt outside the project area. (See *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 369 [110 Cal.Rptr.2d 579].) Moreover, "the purpose of CEQA would be undermined if the appropriate governmental agencies went forward without an awareness of the effects a project will have on areas outside of the boundaries of the project area." (*Ibid.*)

We agree with County that some of the physical changes to the environment resulting from the adoption of Ordinance G-6638 would depend on the reactions of plaintiffs and others to its requirements. Consequently, we will not limit our review to a particular geographical area, but begin by examining (1) the reasonably foreseeable reactions of those affected by the heightened treatment standards, (2) how such reactions might cause physical changes to

---

[39] This farmland represents about 3 percent of the total harvested cropland in Kern County.

the environment, and (3) the environmental significance of those physical changes. The two main groups directly affected by Ordinance G-6638 were sewage sludge generators and the farmers who used Class B biosolids as a fertilizer. We will analyze each group separately.

### A. *Reactions of Sewage Sludge Generators and Related Impacts*

Under the heightened treatment standards of Ordinance G-6638, sludge generators such as CSDLAC, CLABS and OCSD that applied Class B biosolids to agricultural land in Kern County were required to either reduce their production of biosolids or dispose of their biosolids in some other way.

#### 1. *Continued production and disposal of sewage sludge was foreseeable*

It was reasonably foreseeable that the City of Los Angeles, and the Counties of Los Angeles and Orange would continue to produce sewage sludge and would need to dispose of it. County does not dispute this point. The administrative record includes documents stating that the generation of biosolids will continue to increase along with the state's population. Therefore, at the time County certified the negative declaration, it was reasonably foreseeable that the heightened treatment standards would compel CSDLAC, CLABS, OCSD and other agencies to find a substitute for applying Class B biosolids on land within the jurisdiction of Kern County.

#### 2. *Alternative methods of disposal were reasonably foreseeable*

##### a. *Foreseeability of disposal alternatives*

The following alternatives were foreseeable, because of the applicable rules of law governing the use and disposal of sewage sludge and because of information contained in the administrative record: (1) further treatment to convert Class B biosolids to EQ biosolids followed by land application, (2) land application of Class B biosolids somewhere other than Kern County, (3) incineration, or (4) disposal in a landfill.

The applicable rules of law set forth in state statute and federal regulations address land application,[40] landfilling, and incineration of sewage sludge. (See Wat. Code, § 13274, subds. (d), (f) & (g); 40 C.F.R. § 503, subparts B [land application], C [surface disposal, i.e., landfill] & E [incineration].)[41]

---

[40] Land application may involve sewage sludge that has received various levels of treatment. For example, composting may be an intermediate step that prepares the sewage sludge to be applied to land as EQ biosolids.

[41] See generally Goldfarb, *Sewage Sludge, supra*, 26 B.C. Envtl. Aff. L.Rev. at pages 690–697 (discussing the three main ways to dispose of sewage sludge: landfilling, incineration and land application).

Also, land application of sewage sludge that has been treated to heightened standards is suggested by Ordinance G-6638 itself.

The administrative record contains a vast amount of information about the alternative methods for disposing of Class B biosolids. Part of that information was presented in comments from persons familiar with the disposal of sewage sludge. For instance, a September 13, 1999, declaration of James F. Stahl, an assistant chief engineer and assistant general manager of CSDLAC, identified the four alternatives and provided historical data showing the disposal options California had used in the past: "[I]n 1998 approximately 1,849 dry tons per day of sludge were generated in California. Of that amount, approximately 67.8% was land applied, while about 7% was in storage, 5.6% was incinerated, 9% was disposed of in landfills, and 10.6% [was] used in compost. In California, the most common use of land-applied biosolids is for agricultural crop production. . . . [A]bout one-third of all land-applied biosolids in the State of California in 1998 were applied in Kern County."[42]

A letter from the Chief of the Office of Clean Water Act Compliance of Region IX of the EPA indicated the alternatives were (1) treatment to Class A standards, (2) hauling further distances for land application, and (3) adding the organic, nitrogen-rich material to landfills. These methods and incineration were identified in the September 13, 1999, comments jointly submitted by CASA and SCAP and a June 14, 1999, letter signed by attorneys for OCSD, CSDLAC and CLABS. In addition, a letter from the Chair of the Central Valley Water Board mentions landfilling and incineration as alternative methods of disposal.

As a result of the foregoing comments and existing law, the foreseeable alternative methods of disposal of Class B biosolids included (1) land application outside Kern County, (2) further treatment to EQ biosolids standards followed by land application, (3) landfilling and (4) incineration.

### b. *Reasonableness limitation on foreseeable alternatives*

 Next, we consider which of the foreseeable alternatives were *reasonably* foreseeable under the circumstances of this case. Under the fair argument test, the inquiry into what is reasonably foreseeable depends on whether the administrative record contains enough evidence to show a reasonable possibility that a particular alternative would be used in the future.

---

[42] Mr. Stahl relied on a survey conducted by CASA that was described in the State Water Board's 1999 Draft EIR, figure 2-2.

OCSD, CSDLAC and CLABS were among the entities affected by Ordinance G-6638 that submitted comments to County predicting how they would respond to the ordinance.

An assistant general manager of OCSD, Blake P. Anderson, stated in a September 9, 1999, declaration that OCSD intended to respond to the ordinance by (1) converting Class B biosolids to EQ biosolids and (2) hauling the portion of the Class B biosolids not converted to more distant locations for land application. At that time, OCSD was "in the process [of] developing a request for proposals in order to obtain bids for the conversion of OCSD's Class B biosolids to exceptional quality biosolids." Earlier, in comments attached to its June 14, 1999, letter, OCSD discussed the limitations on landfills in Southern California and indicated that the landfills most likely to be used to dispose of Class B biosolids were located in Arizona and Utah.

The declaration of Mr. Stahl, CSDLAC's assistant general manager, stated adoption of the ordinance would cause CSDLAC to apply its biosolids to land further away and, if the sites with permits for land application of Class B biosolids did not have sufficient capacity, to treat the biosolids to meet Class A or EQ standards. Mr. Stahl also addressed the potential alternatives of incineration and local landfilling by stating that (1) incineration was not feasible in Southern California because of its adverse impact on air quality and (2) local landfilling lacked viability because of various constraints placed on those landfills, which included the recycling requirements of the California Integrated Waste Management Act of 1989. Also, Gregory M. Adams, the head of the air quality engineering section of CSDLAC, opined that the incineration of sewage sludge in Southern California was not feasible because of its adverse impact on air quality.

A September 10, 1999, letter from CLABS stated that "[t]o date, our analysis indicates that the alternative with the highest likelihood of immediate success is the conversion of Class B biosolids to what are known as exceptional quality biosolids under the federal regulations." The letter described the testing undertaken for the conversion of Class B biosolids at its Terminal Island wastewater treatment plant and its Hyperion treatment plant and stated that it was reasonably foreseeable that within three years CLABS would be converting 100,000 wet tons per year of Class B biosolids to EQ biosolids. The letter also mentioned that the City of Los Angeles had examined potential alternative sites for land application of Class B biosolids as well as the use of a landfill in Arizona as a backup method for disposal.

The foregoing predictions by entities that would have to change their practices when the heightened treatment standards went into effect are not rendered speculative by virtue of being predictions of future methods of compliance. Predicting the physical changes a project will bring about is an inescapable part of CEQA analysis. (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 919 [100 Cal.Rptr.2d 173] [CEQA compels reasonable forecasting];[43] see *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 398–399 [253 Cal.Rptr. 426, 764 P.2d 278].)

 County contends that, when it adopted Ordinance G-6638, it could only speculate as to which alternative biosolids generators would adopt when the heightened treatment standards went into effect on January 1, 2003. Determining whether alternative methods of compliance with a new ordinance are reasonably foreseeable or speculative depends on the facts in the record rather than a bright-line rule of law. A bright-line rule—stating that the existence of alternative means of compliance with a new rule or regulation would cause each alternative to be so uncertain that it was not reasonably foreseeable—would contradict the requirements for environmental analysis imposed by section 21159, subdivision (a). That subdivision provides that when specified agencies adopt a rule or regulation concerning pollution control, performance standards, or treatment requirements, the agency must perform "an environmental analysis of the reasonably foreseeable methods of compliance."[44] Thus, CEQA recognizes that the existence of alternative methods of compliance does not, in itself, make the alternatives not reasonably foreseeable. Nothing in logic dictates a different conclusion when the new edict is a county ordinance, even though the express terms of section 21159 do not cover ordinances. Consequently, regardless of whether the situation concerns a new rule, regulation or ordinance, whether one or more methods of future compliance are reasonably foreseeable depends upon the quality and quantity of evidence in the administrative record.

The evidence in this case includes predictions of OCSD, CSDLAC and CLABS that are supported by a reasoned analysis of the options available to them, an investigation into the practicalities of those options, and the plans or

---

[43] In addressing forecasting, i.e., predicting or estimating what will occur in the future, the Guidelines state that "[d]rafting an EIR or preparing a negative declaration necessarily involves some degree of forecasting. While foreseeing the unforeseeable is not possible, an agency must use its best efforts to find out and disclose all that it reasonably can." (Guidelines, § 15144.)

[44] The section in the Guidelines corresponding to section 21159, subdivision (a) provides that adoption of a rule or regulation concerning pollution control, performance standards, or treatment requirements by specified state agencies requires an "environmental analysis of the reasonably foreseeable methods by which compliance . . . will be achieved." (Guidelines, § 15187, subd. (a).)

intentions they had formed at that stage of their investigation. Accordingly, the predictions and the information upon which the predictions were based constitute substantial evidence supporting a fair argument that the reasonably foreseeable alternatives for disposing of sewage sludge that otherwise would have been applied to Kern County farmland as Class B biosolids were (1) hauling the Class B biosolids to other locations where land application was allowed, (2) treating the Class B biosolids to meet more stringent standards, and (3) depositing the Class B biosolids in landfills. In other words, based on the record cited on appeal (see Cal. Rules of Court, rule 14(a)(1)(C)), the only alternative method of disposal that was not *reasonably* foreseeable was incineration.

### 3. *Significance of environmental impacts of disposal alternatives*

The next inquiry under the fair argument test is whether the likelihood of implementation of the reasonably foreseeable disposal alternatives created a reasonable possibility of a significant effect on the environment. A project will have a significant effect on the environment if it will cause "a substantial, or potentially substantial, adverse change in" (§ 21068) "the physical conditions [that] exist within the area [that] will be affected by [the] project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (§§ 21060.5 [defining "environment"], 21068 [defining "significant effect on the environment"]; see Guidelines, §§ 15360, 15382.)

One illustration of the foreseeability of secondary environmental impacts occurred in *City of Redlands v. County of San Bernardino* (2002) 96 Cal.App.4th 398 [117 Cal.Rptr.2d 582] where a county approved amendments that modified its general plan relating to land use regulation of unincorporated territory within a city's sphere of influence. The general plan amendment caused the slope development standards to become more lenient in certain areas and created the possibility for development of land previously considered too steep for development. (*Id.* at pp. 412–413.) The Fourth Appellate District held that an expected secondary effect of the adoption of a general plan amendment was an increase in grading that would destroy the natural contours of hillsides and possibly eliminate the natural habitat for plants and animals. (*Id.* at p. 413.) Despite the county's argument that the evidence lacked the necessary specificity and the absence of a particular development project, the court concluded the administrative record contained

"substantial evidence of a fair argument that the amendments [to the general plan] may have a significant effect on the environment." (*Id.* at p. 414.) Thus, the trial court's decision to require the preparation of an EIR was upheld. (*Ibid.*)

### a. *Hauling*

Mr. Anderson stated that OCSD anticipated hauling at least five truckloads of Class B biosolids per day to Kings County and two truckloads per day to Yuma, Arizona, which would involve a total of 2,000 vehicle miles per day and 1,200 vehicle miles per day, respectively.

Mr. Stahl stated Ordinance G-6638 would cause CSDLAC to apply Class B biosolids to land "at a currently-permitted location in Kings County for which [CSDLAC has] an existing contract" and at more remote permitted locations because the permitted capacity in Kings County could only accept about two-thirds of the biosolids generated by CSDLAC, OCSD and CLABS. Mr. Stahl also stated the additional hauling distance to the location in Kings County was approximately 45 miles one way. Based on this additional mileage and the amount of wet tons of sewage sludge CSDLAC produced, Mr. Adams stated that the additional hauling of CSDLAC alone would result in nitrogen oxide (NOx) emissions of 63 pounds per day. Daily operations-related emissions that exceed 55 pounds per day of NOx are considered significant under the thresholds established by the San Joaquin Valley Unified Air Pollution Control District (SJVUAPCD).[45] (See Guidelines, § 15064.7 [public agencies encouraged to develop and publish thresholds of significance]; *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 110–111 [126 Cal.Rptr.2d 441] [adopting quantitative standard as threshold of significance "promotes consistency, efficiency, and predictability in deciding whether to prepare an EIR"].) Accordingly, Mr. Adams concluded that the additional hauling of sewage sludge produced by CSDLAC would have a significant effect on the environment.

The information in the administrative record supported a reasonable inference that the totality of additional hauling of Class B biosolids beyond sites in Kern County to locations in Kings County and further north would create additional NOx emissions that would have a significant adverse impact on the air quality within the jurisdiction of the SJVUAPCD. This determination is based on the levels of significance established by the SJVUAPCD. (See

---

[45] The SJVUAPCD and the South Coast Air Quality Management District (SCAQMD) have both established thresholds of significance for direct and indirect project emissions, such as NOx, reactive organic gases (ROG), carbon monoxide (CO), sulfur oxide (SOx) and fine particulate matter (PM-10).

Guidelines, § 15064.7.) Accordingly, under the fair argument test, an EIR should have been prepared to consider the impact of Ordinance G-6638 on air quality.

### b. *Treatment to EQ standards*

Mr. Stahl's declaration also stated CSDLAC had not built facilities sufficient to process its biosolids to meet Class A or EQ standards, but the design parameters for a pasteurization facility to accomplish that processing had been calculated by CSDLAC and would require approximately 700 MMBTUH[46] for heating in a natural gas boiler and 3,200 Hp[47] for pumping and handling.

The declaration of Mr. Adams states that for the 700 MMBTUH design parameter calculated by CSDLAC for a pasteurization facility, a natural gas fired boiler of that capacity "would emit approximately 111 lbs of NOx and 581 lbs of CO per day at their BACT [best available control technology] levels (i.e., 5 ppm NOx and 50 ppm CO)." This estimate of the per day emission of NOx is more than twice the threshold of significance set by the SCAQMD, and the estimate of CO emission also exceeds the threshold of significance of 550 pounds per day. Mr. Adams also stated that the processing activity necessary for another sanitation agency to convert 100,000 tons of Class B biosolids to EQ biosolids per year would also exceed the thresholds of significance for NOx and CO.

In addition, the declaration of Robert A. Gillette, a civil engineer and principal of Carollo Engineers, described the energy consumption associated with the additional treatment processes used to convert Class B biosolids to Class A biosolids. In his declaration, Mr. Gillette expressed the opinion that the most viable processes for converting Class B biosolids to Class A at a treatment plant were in-vessel composting, heat drying, and lime stabilization. Based on these processes and other data, Mr. Gillette estimated: "If only one third of the Class B biosolids presently used in Kern County are converted to Class A, the electricity usage for these alternatives is equivalent on an annual average basis to the amount used by between 1,500 and 5,000 homes in Southern California, according to data from Southern California Edison. The natural gas usage is equivalent on an annual average basis to the amount used by between 3,000 and 6,000 homes in Southern California according to data from the Southern California Gas Company."

---

[46] Million British thermal units per hour. A British thermal unit is a unit of energy defined as the quantity of heat required to raise the temperature of one pound of water one degree Fahrenheit.

[47] Horsepower, which is a unit of power that can be defined as 550 foot pounds per second or 745.7 watts.

Mr. Gillette also stated his opinion that if 200,000 wet tons per year of Class B biosolids were converted to more stringent standards instead of applied to land in Kern County, "the environmental impact from the additional use of energy would be very significant."

While we recognize that OCSD, CSDLAC and CLABS each had choices in deciding what combination of further treatment and hauling to distant sites to implement, we conclude that a fair argument can be made that the aggregate impact of the alternatives adopted by these entities and the publicly and privately owned treatment works (POTW) serving Kern County communities[48] may cause a substantial, or potentially substantial, adverse change in the air quality within the jurisdiction of the SCAQMD and the SJVUAPCD. Furthermore, a fair argument can be made that the increased energy use caused by further treatment processes would cause a significant effect on the environment.

### c. *Landfill capacity*

The historical data in the administrative record shows that the biggest changes in the disposal and use of biosolids in California between 1988 and 1998 were the reduction in the use of landfills (60.2 percent to 9.1 percent) and the increase in the use of land application (12.7 percent to 67.8 percent). From this data, it is reasonable to infer that land application has acted as a substitute for disposal in landfills and, as land application becomes more difficult, the use of landfills will be a partial substitute for land application. For instance, page 2-2 of the State Water Board's 1999 Draft EIR links the "huge increase in land application" reflected in the 1998 data with the reduction in the use of landfills.

The California Integrated Waste Management Act of 1989 includes the legislative findings that the "amount of solid waste generated in the state coupled with diminishing landfill space and potential adverse environmental impacts from landfilling constitutes an urgent need for state and local agencies to enact and implement an aggressive new integrated waste management program" (§ 40000, subd. (d)), and that the reuse of solid waste would preserve landfill capacity and protect the state's environment (*id.*, subd. (e)).

Based in part on (1) the volume of Class B biosolids applied to land in Kern County before the heightened treatment standards became effective, (2) the use of landfills as a substitute for land application of biosolids, and (3) the legislative findings regarding diminishing landfill capacity and the adverse

---

[48] A Central Valley Water Board letter of September 17, 1999, stated the negative declaration "should also address the impacts of the proposed ban on POTWs serving Kern County communities."

environmental impact associated with landfilling, we conclude that a fair argument exists that the potential increased use of California's limited landfill space to dispose of an organic, nitrogen-rich material may have a significant adverse effect on the environment. Accordingly, that potential environmental impact should be assessed in an EIR.

### d. *Summary*

▉ The reasonably foreseeable reactions of sewage sludge generators to Ordinance G-6638, and the reasonably foreseeable environmental impacts of those reactions, include: (1) increased fuel consumption and vehicle emissions resulting from hauling Class B biosolids greater distances; (2) the consumption of energy for the heating, pumping and handling involved in treating Class B biosolids to meet more stringent standards, and the emissions generated by the additional treatment; and (3) loss of landfill capacity.[49]

### B. *Farmer Reaction and Related Impacts*

Plaintiffs argue that the reaction of Kern County farmers to the heightened treatment standards for sewage sludge applied to land after December 31, 2002, would result in significant impacts, "including the loss of productivity of marginal farmland (EPA, Garvey, Magan), increased air pollution from volatilization of increased pesticide usage, increased dust, and additional truck traffic (EPA, Regional Board, Garvey, Wilson, Tow, Anderson, Stahl, Adams, Hyde, Nixon, Westhoff) . . . increased energy and fuel consumption (Wilson, Gillette, Anderson, Stahl, Nixon), increased erosion and dust (Garvey, Tow), increased water use (Garvey, Dixon, Tow), increased risks to human health (Nixon, Gerba), and loss of habitat for small animals (Garvey)." (Fn. omitted.)

County argues that the evidence referred to by plaintiffs is too general and does not show that "the Ordinance will result in significant environmental impacts on the land to which it applies." County asserts the lack of site-specific evidence occurred because "no physical changes would occur in the unincorporated area during the first three years because the Ordinance allowed the continued use of Class B biosolids; and no significant impacts

---

[49] In determining the foreseeability of a significant environmental impact, predicting what combination of alternatives will be used is less important when environmental impacts are associated with each alternative in the limited array of choices available.

would occur after January 1, 2003 because the Ordinance allows the continued land application of EQ biosolids."

### 1. *Reasonably foreseeable farmer reactions*

Plaintiffs predicted that farmers who could not apply Class B biosolids after December 31, 2002, would react by (1) taking land out of agricultural production, (2) applying animal manure as a substitute for the biosolids, or (3) using chemical fertilizers. County asserts plaintiffs have indulged in assumptions unsupported by facts and have "ignore[d] evidence showing it is far more likely sludge generators will convert their Class B biosolids to EQ, ensuring an adequate substitute for Class B biosolids for anyone who wishes to use them." County supports its prediction by referring to various contracts and related documents of the sanitation agencies that contemplate the use of composting as a disposal option.[50]

In effect, County has argued its forecast of how farmers would react when they could no longer apply Class B biosolids was the only forecast supported by substantial evidence. (See Guidelines, § 15144 [forecasting].) This position is rejected for three reasons.

First, the documents cited by County in its appellate brief were not considered by County in adopting Ordinance G-6638 as they were not a part of the administrative record. (See § 21003, subd. (b) [document cannot be "meaningful and useful to decisionmakers" if it was not available to them].)

Second, County has cited and this court has located no evidence in the administrative record that supports the factual assertion that EQ biosolids are "an adequate substitute for Class B biosolids." Indeed, the evidence in the administrative record, including a letter from the EPA, indicates that most treatment processes for Class B biosolids reduce the nitrogen levels considerably and therefore reduce its value as fertilizer. County contends this evidence is unreliable because another document that was not in the administrative record shows that one of the primary land application sites used by OCSD in Kern County did not need additional nitrogen for crop growth and would not be available for land application of Class B biosolids for a year or more. This attack on the evidence is faulty because (1) it is based on a document that is not in the administrative record; (2) it pertains to only one of the many land application sites in Kern County and provides no basis for inferring that all the other sites have the same characteristic; and (3) the

---

[50] Reliance upon these documents could be an after-the-fact justification because the documents were not part of the administrative record before the Kern County Board of Supervisors when it decided to adopt Ordinance G-6638 and to certify the negative declaration.

period the site was unavailable was not shown to extend to the time the heightened treatment standards went into effect.[51]

Third, even if one were to assume EQ biosolids and Class B biosolids were equivalents as fertilizer, the administrative record does not contain evidence which supports County's assumption that EQ biosolids would be available in sufficient quantities to completely replace Class B biosolids at all land application sites in Kern County. Some of the Class B biosolids that would have been applied in Kern County would be hauled to more distant locations or placed in landfills, which supports the inference that the EQ biosolids generated by the conversion of Class B biosolids would not be sufficient to completely replace the use of Class B biosolids.

Consequently, we reject County's position that the only reasonable forecast of the farmers' reaction to the implementation of the heightened treatment standards was that they all would use EQ biosolids as a substitute for Class B biosolids. Instead, substantial evidence in the administrative record shows that it was reasonable to forecast that the farmer reactions also would include taking marginal land out of production and substituting other types of fertilizer to replace the Class B biosolids. (See *League for Protection of Oakland's etc. Historic Resources v. City of Oakland, supra,* 52 Cal.App.4th at pp. 904–905 [substantial evidence of one impact is not negated if the record also contains substantial evidence showing a different impact will result].)

The forecast that farmers would take land out of production was reasonable because one farmer told the Kern County Board of Supervisors that the availability of Class B biosolids made it feasible for him to bring 1,200 acres of marginal alkali soil into production, and another stated that the availability of biosolids as a free fertilizer allowed him to break even on a 160-acre parcel. Shaen Magan wrote a letter indicating that if he was unable to continue farming with the use of biosolids, then approximately 4,000 acres of his farmland located in Kern County would revert to open-range land. From these statements, it is reasonable to infer that without the free application of Class B biosolids, the marginal land would be taken out of production.

The forecast that some land would remain in production and substitutes would be used was reasonable because Pat McCarthy stated that he was currently applying Class B biosolids in his family's farming operations and, similar to gypsum, sulfur, animal waste and dairy waste, it was just one tool available to farmers. This statement supports an inference that he would

---

[51] In other words, County failed to show that by January 1, 2003, nitrogen levels at the site would have remained so high that EQ biosolids could have been used as fertilizer without any need for an additional source of nitrogen.

continue to farm by using one or more other types of fertilizer available to replace the Class B biosolids.

## 2. *Potential environmental impacts of farmer reactions*

### a. *Dust and air quality*

Plaintiffs claim substantial evidence shows that "[a]t marginal sites that are currently used for Class B biosolids application, there will be a significant increase in soil loss of approximately 28,800 tons per year as PM-10 (Dust)" and cite to a letter prepared by Harry A. Tow, a principal engineer with Quad Knopf, Inc. In his letter, Tow states that sites left fallow and unfarmed will experience a significant increase in soil loss through wind erosion. The figure of 28,800 tons per year calculated by Tow equates to approximately 157,808 pounds per day, which is over 1,000 times the 150 pounds per day threshold of significance established for PM-10 by the SJVUAPCD for any project.

Tow also stated that more dust and odor is likely to be created where animal manure is used as a substitute for Class B biosolids because the transport and application of dry manure is not regulated and it could be applied in wind conditions where the application of biosolids would not be allowed.

Plaintiffs also cite a September 10, 1999, letter written on behalf of OCSD by Diane D. Garvey, who has a degree in civil and environmental engineering and a 20-year career in biosolids management. Garvey's company is Garvey Resources, Inc., and it is located in Lansdale, Pennsylvania. In Garvey's opinion, farmers who use chemical fertilizers as a substitute for biosolids will suffer increased soil loss from wind erosion because biosolids reduce soil erosion by increasing the amount of organic matter in the soil, which improves the soil's structure and cohesion. To support her opinion, Garvey quotes from an article titled "Agricultural Tillage Systems: Water Erosion and Sedimentation" published by the Soil and Water Conservation Society.

### b. *Increased use of animal manure*

Plaintiffs contend a fair argument exists that increased use of animal manure by farmers affected by Ordinance G-6638 would lead to more surface water pollution, more groundwater pollution and the spread of pathogens such as cryptosporidium, giardia, salmonella and E. coli. This argument is supported by a report by the United States Geological Survey and a report prepared for United States Senator Tom Harkin, both of which are in the administrative record, and show that animal manure has had an adverse impact on the environment at locations across the country and in California.

Plaintiffs also cite the September 10, 1999, letter written by Garvey which asserted that increased use of animal manure would increase (1) nitrate contamination of groundwater and (2) the spread of disease because animal manure is not treated to reduce pathogens like Class B biosolids. Garvey asserts biosolids cause less nitrate contamination because biosolids are closely monitored and more consistent in quality; in contrast, the quality of animal manure can vary greatly in solids and nitrogen content based on the age of the manure, storage method, the feed given to the animals and their weight. The inconsistent quality of manure means that some areas of a field will receive more nitrogen than can be used by the crops and the excess nitrates will contaminate the groundwater.

With respect to the pathogens in animal manure, plaintiffs cite a September 13, 1999, letter from Charles P. Gerba, Ph.D., from the Department of Soil, Water and Environmental Science at the University of Arizona, which described some of the pathogens found in animal manure, asserted outbreaks of some of these pathogens were associated with the use of animal manure as a fertilizer, and observed that animal manure that is land applied is not regulated for pathogen removal, unlike Class B biosolids.[52] The lack of regulatory oversight to the land application of animal manure also is mentioned in the comments submitted to County by the EPA.

### c. *Increased use of concentrated chemical fertilizers*

Plaintiffs assert substantial evidence shows that increased use of concentrated chemical fertilizers by affected farmers would lead to a number of adverse environmental impacts including (1) soil erosion,[53] (2) surface water pollution, (3) groundwater pollution, (4) increased use of irrigation water, (5) decreased crop production and (6) increased use of pesticides.

We agree that it is reasonable to forecast that this farmland will have a lower organic content than it would have had if Class B biosolids had continued to be applied. There is ample evidence in the administrative record showing that the application of biosolids increases the organic content of soil. For example, the September 9, 1999, letter submitted to County by Robert C. Dixon, a certified professional agronomist, indicates that biosolids are an organic soil amendment with a high level of organic matter.

---

[52] Under Part 503, sewage sludge must be treated to significantly reduce pathogens to obtain Class B status. (See 40 C.F.R. § 503.32(b) (2005) [Class B pathogen requirements and site restrictions].)

[53] The soil loss from wind erosion is discussed in part II.B.2.a., *ante.*

Both Garvey and Dixon asserted that the substitution of chemical fertilizers for biosolids could result in adverse impacts to the environment by (1) decreasing the ability of the soil to retain water and thus increasing the amount of water used to irrigate crops, and (2) increasing the amount of nutrients likely to leach below the root zone before they can be utilized by the crops and thereby increasing the amount of nutrients that leach into and pollute the groundwater.

Dixon also asserted that the increase in organic matter from biosolids increases the ability of the soil to hold onto pesticides, fertilizers and the soil itself. Thus, the water runoff from fields using biosolids would pollute surface water less because the runoff would transport fewer nutrients, pesticides and sediment.

Garvey asserted that the decrease in organic matter would decrease beneficial microbial populations in the soil and would increase farmer dependence on pesticides.

### 3. *Significance of potential impacts from farmer reactions*

On our own initiative, we could provide bases on which to attack the significance of the above noted potential impacts to the environment arising from the reasonably foreseeable reactions of affected farmers.[54] County, however, has not provided any detailed analysis of the potential impacts plaintiffs have identified, other than to argue (1) the potential impacts will not arise because farmers will use EQ biosolids as a replacement for Class B biosolids and (2) plaintiffs' claims are based on (a) unsupported assumptions and opinions and (b) biased and unreliable information. (See § 21080, subd. (e); Guidelines, § 15384, subd. (a); *Leonoff v. Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337, 1349 [272 Cal.Rptr. 372] [agency entitled to disbelieve biased witness].)

Neither of County's arguments is compelling. First, substantial evidence in the record establishes a reasonable possibility that farmers would react to the heightened treatment standards in various ways (see part II.B.1., *ante*) and thus would not limit their reaction to using EQ biosolids as a complete substitute for Class B biosolids. Moreover, County's argument appears to be an after-the-fact rationalization for a decision already made because the

---

[54] For example, Tow's analysis of the impact of dust on air quality suffers from a rather glaring deficiency—his failure to compare the potential dispersal of PM-10 after January 1, 2003, to the dispersal of PM-10 from the same land while it was farmed and biosolids were applied to it. The question, of course, is *change* to the environment which might arise from the ordinance. (See § 21068; Remy et al., Guide to the Cal. Environmental Quality Act (CEQA) (10th ed. 1999) p. 162 (Remy, Guide to CEQA).)

administrative record contains no evidence that County seriously investigated whether EQ biosolids would be a complete substitute for the Class B biosolids that had been used.[55] The after-the-fact nature of the position is illustrated by County's inability to cite any supporting evidence in the administrative record. (See fn. 50, *ante.*)

 Second, County's generalized assertion that the evidence relied upon by plaintiffs was biased and unreliable fails because County (1) did not make any express credibility findings in connection with its approval of the negative declaration and (2) has not shown that there were " 'legitimate, disputed issues of credibility.' [Citation.]" (*Stanislaus Audubon Society, Inc. v. County of Stanislaus, supra,* 33 Cal.App.4th at p. 151.) Were we to accept County's broad-brush assertion of the incredibility of plaintiffs' evidence, the fair argument test would be effectively eviscerated because much of the evidence submitted in administrative proceedings concerning CEQA projects comes from people and entities who are interested in the outcome of the lead agency's decision. Instead, we hold that before an agency may rely on its purported rejection of evidence as incredible, it must first identify that evidence with sufficient particularity[56] to allow the reviewing court to determine whether there were legitimate, disputed issues of credibility. (E.g., *Leonoff v. Monterey County Bd. of Supervisors, supra,* 222 Cal. App. 3d at pp. 1351–1353 [court upheld county's rejection of project opponents' evidence of purportedly significant traffic impacts].)

We refrain from supplying arguments County has not made, or from requesting further briefing, because to do so would not reflect County's actual analysis but would simply create more after-the-fact justifications. Moreover, it would not change the need to remand this matter with directions to County to prepare an EIR. (See part II.A., *ante.*)

 We also agree with plaintiffs that, under CEQA, the lead agency bears a burden to investigate potential environmental impacts. "If the local agency has failed to study an area of possible environmental impact, a fair argument may be based on the limited facts in the record. Deficiencies in the record may actually enlarge the scope of fair argument by lending a logical plausibility to a wider range of inferences." (*Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, 311 [248 Cal.Rptr. 352].)

---

[55] For instance, in completing the initial study County did not investigate the basic question of quantity—whether the volume of EQ biosolids available for application to farmland in Kern County would be sufficient to replace the volume of Class B biosolids that had been used.

[56] Under the facts of this case, we need not decide whether that identification must take place in explicit findings by the agency, elsewhere in the administrative record, or in the briefing submitted by the lead agency to the court.

In this case, Tow's calculation regarding the creation of 28,800 tons per year of PM-10 is not a reasonable prediction. Nevertheless, County failed to study the impact of dust on air quality and, as a result, there exists a plausible inference that the heightened treatment standard could cause, in the aggregate, the addition of 150 pounds per day of PM-10 to the air within the jurisdiction of the SJVUAPCD based on (1) Tow's analysis of wind erosion from fallow land, (2) Tow's analysis of the additional dust that will result from the use of animal manure, (3) Garvey's claim that increased use of chemical fertilizers will affect soil structure and lead to more wind erosion, and (4) the PM-10 from the additional truck emissions created by further hauling distances. Accordingly, the heightened treatment standards may have a significant adverse impact on the amount of PM-10 in the air and an EIR should address this potential impact.

In addition, we conclude the impacts from the increased use of animal manure and the increased use of chemical fertilizers may have a significant adverse impact on the environment and should be addressed in an EIR.

### C. Magan v. County of Kings *Is Distinguishable*

In *Magan v. County of Kings, supra,* 105 Cal.App.4th 468, the Kings County Board of Supervisors found that an ordinance regulating the application of sewage sludge to land in Kings County was categorically exempt from review under CEQA as an action taken by a regulatory agency for the protection of the environment. (See Guidelines, § 15308 [class 8 categorical exemption concerning protection of the environment]; see also § 21084.) In upholding the superior court's denial of a writ of mandate, this court determined that (1) the county met its burden of showing substantial evidence supported the board of supervisors' decision that the ordinance fell within the categorical exemption (*Magan,* at p. 476) and (2) that the petitioner failed to meet his burden of producing substantial evidence showing a reasonable possibility of adverse environmental impact sufficient to remove the ordinance from the categorically exempt class (*ibid.*). In particular, this court observed that the petitioner "has failed to support his claims with *any* evidence in the record. The claims are based entirely on speculation." (*Id.* at p. 477.)

The present case is distinguished easily from *Magan v. County of Kings* based on the contents of the administrative record.[57] In this case, the administrative record contains a large quantity of specific information about alternative methods of disposing of the Class B biosolids that otherwise

---

[57] This court has emphasized the importance of connecting one's arguments to the contents of the administrative record in a CEQA proceeding. (*Protect Our Water v. County of Merced* (2003) 110 Cal.App.4th 362 [1 Cal.Rptr.3d 726]; see Cal. Rules of Court, rule 14(a)(1)(C).)

would have been applied to Kern County farmland and the environmental significance of the impact of those alternatives on energy consumption, air quality within the jurisdiction of the SJVUAPCD, and landfill capacity. Thus, plaintiffs in this case have done exactly what the petitioner in *Magan v. County of Kings* failed to do—produced substantial evidence to support their argument that the ordinance would indirectly cause "a substantial, or potentially substantial, adverse change in" "the physical conditions [that] exist" inside and outside the county. (§§ 21060.5, 21068; Guidelines, §§ 15360, 15382; *Heninger v. Board of Supervisors* (1986) 186 Cal.App.3d 601, 609–611 [231 Cal.Rptr. 11] ["considerable body of evidence" supported a fair argument that an ordinance amendment authorizing installation of alternative private sewage disposal systems might have a significant effect on the environment; thus, a negative declaration was inappropriate and the preparation of an EIR was required].)

### D. *Deferral of Environmental Analysis*

County asserts deferring the preparation of an EIR was appropriate because the uncertainty over how the sanitation agencies would react to Ordinance G-6638 rendered environmental analysis of those reactions premature.

#### 1. *Deferral and the fair argument test*

 A threshold issue is how the concept of deferral of environmental analysis interacts with the fair argument test. When a public agency *is preparing an EIR* and decides to defer environmental review of an action that may be taken in the future, courts analyze the decision to defer environmental review under a specific test. (See *National Parks & Conservation Assn. v. County of Riverside* (1996) 42 Cal.App.4th 1505, 1516–1520 [50 Cal.Rptr.2d 339] [deferral of environmental analysis in the context of EIR preparation and the test for deferral].) That test provides that the "discussion of a [future potential action] is not required in an EIR for the project . . . if: (1) obtaining more detailed useful information is not meaningfully possible at the time when the EIR for the project is prepared, and (2) it is not necessary to have such additional information at an earlier stage in determining whether or not to proceed with the project." (*Id.* at p. 1518.)[58]

---

[58] A dispute over the application of the test for deferral often is closely related to a dispute concerning the proper scope of the project and whether a line can be drawn between the project covered by the EIR and the future action for which environmental analysis is deferred. (See *National Parks & Conservation Assn. v. County of Riverside, supra,* 42 Cal.App.4th at pp. 1514–1515; see also *No Oil, Inc. v. City of Los Angeles* (1987) 196 Cal.App.3d 223, 236–237 [242 Cal.Rptr. 37] [discussion of pipelines in an EIR for exploration phase of multistage oil project need not address specific pipeline routes because quantity and quality of oil discovery was uncertain and another EIR would be prepared in connection with the city's approval of a specific pipeline route].)

██ In the context of a negative declaration, however, the courts have not used this test to determine whether the approval of the negative declaration complies with CEQA. (See *Pala Band of Mission Indians v. County of San Diego* (1998) 68 Cal.App.4th 556, 580 [80 Cal.Rptr.2d 294] (*Pala Band*) [applying fair argument test, court held preparation of EIR would be premature; upheld negative declaration]; *Sundstrom v. County of Mendocino*, *supra*, 202 Cal.App.3d at pp. 306–307 [deferring environmental assessment related to mitigation measures violated CEQA; negative declaration held invalid].) Further, we believe that use of an inquiry separate from the fair argument test would be inappropriate if it were used to raise or lower the threshold imposed by that test. Because the concept of deferral of environmental review does not change the threshold imposed by the fair argument test, there is no need for a separate inquiry. In other words, the idea of deferral is subsumed in the fair argument test, which considers whether a potential environmental impact is speculative or reasonably foreseeable; undertaking a separate inquiry would be redundant.

### 2. *Timing and Guidelines section 15004*

County contends preparation of an EIR would have been premature because "meaningful information for environmental assessment" (Guidelines, § 15004, subd. (b)) was not available at the time Ordinance G-6638 was adopted.

Section 15004 of the Guidelines addresses the time for preparation of an EIR or negative declaration, and subdivision (b) states: "Choosing the precise time for CEQA compliance involves a balancing of competing factors. EIRs and negative declarations should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment." The "Discussion" that follows section 15004 of the Guidelines states: "This section codifies the requirement that EIRs and Negative Declarations be prepared before an agency makes a decision on the project and early enough to help influence the project's plans or design. For EIRs and Negative Declarations to be effective in serving the purposes of CEQA, the preparation of these documents must be coordinated with the planning, review, and approval processes as described in subsection (c). Early preparation is necessary for the legal validity of the process and for the usefulness of the documents. Early preparation enables agencies to make revisions in projects to reduce or avoid adverse environmental effects before

the agency has become so committed to a particular approach that it can make changes only with difficulty."[59]

County's timing argument is ill-suited to the facts of this case because it (1) confuses deferring environmental analysis of Ordinance G-6638 with avoiding it and (2) treats the reactions of the sanitation agencies as though they were part of the same CEQA project.[60]

An agency's deferral of environmental assessment was appropriate in *Pala Band, supra*, 68 Cal.App.4th 556, and *Kaufman & Broad-South Bay, Inc. v. Morgan Hill Unified School Dist.* (1992) 9 Cal.App.4th 464 [11 Cal.Rptr.2d 792] (*Kaufman & Broad*) because the agency had the opportunity to assess all of the physical impacts of its multistage activity in an EIR prepared by the agency at a later stage of the project. Thus, those cases do not use timing considerations to justify an agency's completely avoiding the preparation of an EIR for its project.

In *Pala Band, supra*, 68 Cal.App.4th 556, the County of San Diego adopted a countywide integrated waste management plan, which was a statutory prerequisite to the development of new landfills in the county. The court held the preparation of an EIR would be premature where all 10 proposed landfill sites identified in the siting element of the plan were only "tentatively reserved" and the county had made no commitment to develop any of the sites. (*Id.* at pp. 574–575, 580.) Thus, it was not "reasonably foreseeable at the current planning stage that any of the sites will actually be developed" (*id.* at p. 575), and the county could wait and subsequently prepare an EIR to help it decide which sites to actually develop.

Similarly, in *Kaufman & Broad, supra*, 9 Cal.App.4th 464, a school district formed a consolidated facilities district (CFD) but did not prepare an EIR. The formation of the CFD was merely an initial step and many alternative courses of action remained open to the school district. (*Id.* at p. 476.) For instance, formation of the CFD did not commit the school district to build a new facility, buy or lease portable classrooms, or rehabilitate existing facilities. (*Id.* at pp. 474–475.) The formation of the CFD caused no physical changes to the environment and it was not an essential step culminating in

---

[59] The Discussion is available on the Internet at <http://ceres.ca.gov/topic/env_law/ceqa/guidelines/art1.html> (as of Apr. 1, 2005). (See generally *San Franciscans for Reasonable Growth v. City and County of San Francisco* (1987) 189 Cal.App.3d 498, 503, fn. 1 [234 Cal.Rptr. 527] [judicial notice taken of the "Discussion" that followed a section of the Guidelines].)

[60] The project description contained in County's proposed negative declaration states the project is "the adoption of a Kern County ordinance regulating the land application of Class A and B biosolids . . . ." The project description does not include any biosolids management activities that might be undertaken by sanitation agencies in response to the ordinance.

activity that might cause physical changes to the environment. (*Id.* at p. 474.) In other words, physical changes would not occur until the district actually committed to building a new facility or some other course of action. Therefore, the school district itself had the opportunity to prepare an EIR when it committed to a stage of the project that would cause a physical change to the environment.[61] (Cf. Guidelines, § 15165 [issues raised by multiple and phased projects where significant environmental impacts arise earlier in the process].)

The present case is distinguishable from *Pala Band* and *Kaufman & Broad* because the adoption of Ordinance G-6638 was a definitive action by County that *completed* its project and, accordingly, County had no opportunity to assess the indirect physical impacts of Ordinance G-6638 before those impacts occurred. Therefore, we reject County's attempts to use cases upholding a public agency's deferral of EIR preparation as support for its avoidance of EIR preparation.

Furthermore, in this case the CEQA "project" was Ordinance G-6638 itself. (See fn. 58, *ante.*) The final form of that project was proposed at the time Ordinance G-6638 was proposed, and County's commitment to the project became final when it adopted that ordinance. By avoiding the preparation of an EIR, County committed to a particular approach and completed its project without the benefit of the environmental analysis and information an EIR would have contained.

### 3. *Each agency has separate CEQA responsibilities*

Another aspect of County's deferral argument is that (1) the sanitation agencies are responsible for performing an environmental review of the potential environmental impacts resulting from the changes those agencies make in their biosolids management programs, and (2) plaintiffs are trying to

---

[61] The analogy between the adoption of a land use ordinance and the multistage activities involved in *Pala Band* and *Kaufman & Broad* is weak. The stronger analogy is between the adoption of Ordinance G-6638 and the adoption of (1) an amendment to a general plan, (2) revised sphere of influence guidelines, or (3) development plans for an area surrounding an airport. (See *City of Redlands v. County of San Bernardino, supra,* 96 Cal.App.4th at pp. 412–413 [adoption of negative declaration set aside and county required to prepare an EIR in connection with general plan amendment]; *City of Livermore v. Local Agency Formation Com.* (1986) 184 Cal.App.3d 531 [230 Cal.Rptr. 867] [LAFCO's negative declaration vacated and preparation of EIR required for changes in sphere of influence guidelines regarding urban development]; *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors, supra,* 91 Cal.App.4th at p. 369 [final subsequent EIR certified in connection with approval of updated specific plan for development of area surrounding county airport properly considered "project's effect on growth and housing . . . felt outside of the project area"].)

avoid this responsibility by foisting it on County. We reject County's argument because it misses the mark on how CEQA operates. If only the sanitation agencies were required to prepare, supplement, or amend their EIR's, there would be no environmental review of (1) feasible alternatives to the heightened treatment standards adopted in Ordinance G-6638, (2) its cumulative impacts, and (3) mitigation measures available to County but not the sanitation agencies. Under this approach, the environmental review contemplated by CEQA would contain a gap, and California's environment would be deprived of the benefits that might result from County's consideration of feasible alternatives, cumulative impacts, and mitigation measures.[62]

■ Furthermore, the fact that County must prepare an EIR does not absolve the sanitation agencies of their responsibilities to comply with CEQA. (See part VII., *post*.)[63] As noted by the Third Appellate District in *Citizens for Quality Growth v. City of Mt. Shasta* (1988) 198 Cal.App.3d 433 [243 Cal.Rptr. 727], "*Each* public agency is required to comply with CEQA and meet its responsibilities, including evaluating mitigation measures and project alternatives. (See Guidelines, § 15020.)" (*Id.* at p. 442, fn. 8.) When agencies—even agencies with antagonistic positions—comply with their responsibilities for environmental review under CEQA, their action should be taken after consideration of the other's position and, as a result, their action may achieve a measure of coordination that would not have existed without that review. (See § 21000, subds. (d) & (f).)

E. *Relief Appropriate Under Section 21168.9*

Section 21168.9 sets forth the requirements for the court order entered after a failure to comply with CEQA has been found. (See *San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (2001) 89 Cal.App.4th 1097, 1102–1103 [109 Cal.Rptr.2d 108].) An order granting relief for CEQA violations "shall include only those mandates . . . necessary to achieve compliance with [CEQA] and only those specific project activities in noncompliance with [CEQA]." (§ 21168.9, subd. (b).) In this case, the specific project activity that did not comply with CEQA was the approval of the negative declaration and the adoption of the heightened treatment standards.

---

[62] Plaintiffs point to the State Water Board's 1999 Draft EIR contained in the administrative record and argue that if the adoption of General Order 2000-10 at the state level created potential impacts that could be foreseen and required analysis, then the potential impacts from the adoption of Ordinance G-6638 (which represented a greater change from the status quo) also must be foreseeable. In plaintiffs' view, consistent application of CEQA's concept of foreseeability at the state and county level requires rejection of County's position that the potential physical impacts of Ordinance G-6638 were so attenuated as to be unforeseeable.

[63] Justice Stephen Breyer has described the problem of regulatory inconsistency which can arise when agencies ignore their regulatory program's environmental effect on other programs. (See Breyer, Breaking the Vicious Circle: Toward Effective Risk Regulation, *supra*, pp. 21–22.)

 Accordingly, the order could mandate that County void all or part of its decision to approve the negative declaration and adopt the heightened treatment standards. (§ 21168.9, subd. (a).) The order also could mandate that County take specific action necessary to bring its decision into compliance with CEQA. (§ 21168.9, subd. (a)(3).)

We requested supplemental briefing concerning how section 21168.9 should be applied in this case and what directions should be given to the superior court on remand. (Gov. Code, § 68081.) We asked whether the heightened treatment standard should be voided or allowed to remain in effect pending the completion of an EIR, and whether the adoption of Ordinance No. G-6931, which repealed Ordinance G-6638 but reenacted the heightened treatment standards, should affect the relief ordered.

The parties concurred that the heightened treatment standards should remain operative pending County's (1) completion of an EIR in good faith and without unnecessary delay and (2) approval of. whatever replacement version of the biosolids ordinance is generated as a result of completing the EIR.[64] This position presumes (1) the severability of the heightened treatment standards from the other provisions in Ordinance G-6638 as well as from the additional provisions added by Ordinance No. G-6931, such as the licensing permit required for the land application of EQ biosolids, and (2) that the equities favor it. Because we conclude both of these presumptions are appropriate, we will accept the position adopted by the parties.

 First, we conclude that the heightened treatment standards are grammatically, functionally, and volitionally severable from the remainder of chapter 8.05 as adopted by Ordinance G-6638 or as currently in effect under Ordinance No. G-6931. (See *Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 821–822 [258 Cal.Rptr. 161, 771 P.2d 1247].)[65] Therefore, the CEQA violations relating to the adoption of the heightened treatment standards do not infect the other provisions of the ordinances. (See § 21168.9, subd. (b).)

Second, County and CSDLAC both state they are unaware of any published case in which (1) a negative declaration that related to the adoption of an ordinance, regulation or general order was ruled invalid under CEQA, and (2) the appellate court did not invalidate the ordinance, regulation or general

---

[64] At the time County begins the EIR process, it will not know the exact terms of the ordinance that it might approve at the end of that process because the terms it initially proposes, i.e., the "project," may be revised after considering feasible alternatives and mitigation measures.

[65] This conclusion regarding severability does not mean, however, that the heightened treatment standards are the entire "project" for purposes of determining the scope of the EIR.

order itself. (Cf. *Friends of Sierra Madre v. City of Sierra Madre, supra,* 25 Cal.4th at p. 196 [appropriate relief for noncompliance with CEQA was invalidation of ordinance; ordinance not allowed to remain in effect pending compliance with CEQA]; *No Oil, Inc. v. City of Los Angeles, supra,* 13 Cal.3d at p. 88 [superior court directed to set aside three ordinances].) Nevertheless, a remedy less severe than immediately voiding the heightened treatment standards may be ordered if supported by equitable principles. (See *Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at pp. 423–425; *San Bernardino Valley Audubon Society v. Metropolitan Water Dist., supra,* 89 Cal.App.4th at p. 1104.) Because the heightened treatment standards currently contained in Ordinance No. G-6931 have been in effect for over two years, we will follow the more steady course of allowing the status quo to continue pending the completion of an EIR. The alternative of reverting to a situation where the application of Class B biosolids is not subject to any local regulation and then, after an EIR is completed, possibly returning to a situation where Class B biosolids either cannot be land applied or are highly regulated by County would be disruptive to County, the sanitation agencies, and the members of the biosolids industry that are subject to the ordinances.

In light of (1) the position of the parties, (2) the authority given to the courts in section 21168.9 to fashion the terms of the writ of mandate, and (3) the equitable considerations relevant to this proceeding, we hold that the heightened treatment standards may continue in effect provided that County prepares, in good faith without unnecessary delay, an EIR that complies with CEQA. If County decides to forgo regulating the application of biosolids to land, or does not prepare an EIR in good faith[66] and without unnecessary delay, then the superior court shall enter an order that immediately invalidates the heightened treatment standards. Questions concerning County's good faith or lack of diligence, if raised, shall be decided by the superior court in the first instance.

III. *Ordinance G-6638 Is Consistent with Water Code Section 13274*

In the proceedings before the superior court, County argued that Ordinance G-6638 was a local determination concerning sewage sludge that was authorized by Part 503 and by Water Code section 13274. Plaintiffs agree that Water Code section 13274 allows a county to impose stricter regulations than

---

[66] One issue that may arise in connection with the good faith of County's attempt to prepare an EIR is whether its definition of the scope of the EIR appropriately considers the "project" to include the "whole of an action" actually implemented by County in regulating the land application of sewage sludge. (Guidelines, § 15378, subd. (a); see *Association for a Cleaner Environment v. Yosemite Community College Dist.* (2004) 116 Cal.App.4th 629, 637–640 [10 Cal.Rptr.3d 560].)

those contained in the federal regulations on the land application of Class B biosolids. Plaintiffs contend, however, that County has imposed an outright ban and thus has gone further than Water Code section 13274 allows when it is read in conjunction with Part 503. (See *Blanton v. Amelia County* (2001) 261 Va. 55 [540 S.E.2d 869] [county ordinance banning use of biosolids on farmland held invalid because of conflict with Virginia statute and regulations]; *O'Brien v. Appomattox County* (W.D.Va. 2003) 293 F.Supp.2d 660 [same]; *Franklin County v. Fieldale Farms Corp.* (1998) 270 Ga. 272 [507 S.E.2d 460] [Georgia water quality statute regulating land application of sludge implicitly preempted county ordinance regulating land application of sewage sludge, except in area of monitoring].)

Plaintiffs' contention presents an issue of statutory construction concerning the meaning of subdivision (i) of section 13274 of the Water Code, which provides: "Nothing in this section restricts the authority of a local government agency *to regulate* the *application of sewage sludge* and other biological solids to land within the jurisdiction of that agency, . . ." (Italics added.)

■■■■ Under plaintiffs' statutory construction, the word "regulate" does not include the authority to prohibit an activity. Accepting this narrow view of the word "regulate" for purposes of argument,[67] it does not follow that County lacks the authority to prohibit the application of Class B biosolids to land within its jurisdiction. This is because the statute refers to "sewage sludge" and not specifically to Class B biosolids.[68] Ordinance G-6638 did not prohibit "the application of sewage sludge . . . to land within the jurisdiction of [County]" (Wat. Code, § 13274, subd. (i)) within the usual, ordinary meaning of that language because it would have allowed the application of sewage sludge that has been treated to specified, stringent standards. By allowing the land application of EQ biosolids, Ordinance G-6638 would have regulated how much treatment sewage sludge must receive before it was applied within the unincorporated area of Kern County. Accordingly, the heightened treatment standards do not conflict with Water Code section 13274 when the term "sewage sludge" is given its usual, ordinary meaning—that is, read literally.[69]

---

[67] But see *Young v. Department of Fish & Game* (1981) 124 Cal.App.3d 257, 279 [177 Cal.Rptr. 247] ("power to regulate includes the power to prohibit"); *Watkins v. Naifeh* (Tenn. 1982) 635 S.W.2d 104, 107 ("extremely broad powers to regulate the sale . . . of alcoholic beverages . . . extends even to the power to ban such sales"); see also *Personal Watercraft Coalition v. Marin County Bd. of Supervisors* (2002) 100 Cal.App.4th 129, 150 [122 Cal.Rptr.2d 425].

[68] Class B biosolids are one category of "sewage sludge," which Part 503 defines as the "solid, semi-solid, or liquid residue generated during the treatment of domestic sewage in a treatment works." (40 C.F.R. § 503.9(w) (2005).)

[69] We need not reach the question of statutory construction concerning whether the authority to "regulate" includes or excludes the authority to ban an entire activity. Thus, although we requested supplemental briefing on whether it would be appropriate for this court to take

Furthermore, plaintiffs have not demonstrated a legislative purpose that justifies narrowly construing the term "sewage sludge" to mean only Class B biosolids rather than using the broader, literal construction of the term set forth in 40 Code of Federal Regulations part 503.9(w) (2005). (See *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299] [literal construction should prevail unless contrary to legislative purpose].) Thus, the heightened treatment standards do not conflict with Water Code section 13274 when that section is read in conjunction with Part 503. (See 40 C.F.R. § 503.5(b) (2005) [state and local government authorized to impose more stringent requirements].)

## IV. Commerce Clause Analysis

Plaintiffs contend that the heightened treatment standards in Kern Code provision 8.05.040(A),[70] Ordinance G-6638, violate the commerce clause of the United States Constitution (U.S. Const., art. I, § 8, cl. 3) in that those standards (1) impermissibly discriminate against out-of-county biosolids by allowing municipalities located in Kern County to apply their own Class B biosolids on land in the incorporated areas of Kern County, and (2) were adopted for the protectionist purpose of banning out-of-county biosolids in order to prevent damage to the reputation of agricultural products grown in Kern County.

As factual support for the first of these contentions, plaintiffs point out that the City of Bakersfield maintains an extensive Class B biosolids application program within its incorporated area. At an April 27, 1999, hearing before the Kern County Board of Supervisors, Lauren Fondahl, the biosolids coordinator for the EPA regional office in San Francisco, observed that the proposed ordinance would not prevent Bakersfield and other cities in Kern County from applying Class B biosolids on city lands, and stated that "Bakersfield has been applying for many years now on lands across from East Planz Road[.] Wasco, Taft, Delano and North of Kern in Kern Community Service District have also been applying on city lands for years."[71]

---

judicial notice of State Water Board's General Order 2004-0012, which states the Water Code does not preempt the authority of local agencies to prohibit the use of biosolids, we need not consider the weight to give the regulatory agency's construction of the statute. (See generally *Yamaha Corp. of America v. State Bd. of Equalization* (1999) 19 Cal.4th 1, 6–8 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)

[70] See footnote 36, *ante.*

[71] According to the Web site maintained by the City of Bakersfield Public Works Department, approximately 3,541 dry tons per year of Class B biosolids produced from two treatment plants are applied to 5,000 acres of farmland owned by the city. (<http://www.bakersfieldcity.us/cityservices/pubwrks/wastewater> [as of Apr. 1, 2005].) Assuming an even distribution, each square foot of farmland would receive approximately five ounces of Class B biosolids per year.

In contrast to the Bakersfield example, however, the administrative record also shows that not all municipalities located in Kern County were able to apply their Class B biosolids on land within an incorporated area of Kern County. A September 13, 1999, letter from the City of Shafter indicated that the city had applied biosolids from its treatment plant to neighboring agricultural land that was in the unincorporated area of Kern County and stated that the proposed ordinance would "force local, smaller communities, which rely on cost-saving alternatives to promote growth and development, to explore other methods of biosolid use or treatment that require technology and resources that we may not be able to acquire."

### A. *Scope of the Dormant Commerce Clause*

 The commerce clause of the federal Constitution delegates to Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." (U.S. Const., art. I, § 8, cl. 3.) This explicit grant of power has been interpreted as an implied limitation on the power of states and local government to adopt statutes, regulations and ordinances that burden or interfere with interstate commerce. (*West Lynn Creamery, Inc. v. Healy* (1994) 512 U.S. 186, 192 [129 L.Ed.2d 157, 114 S.Ct. 2205].) Known as the "dormant" or "negative" commerce clause (*Barclays Bank PLC v. Franchise Tax Bd. of Cal.* (1994) 512 U.S. 298, 311, fn. 9 [129 L.Ed.2d 244, 114 S.Ct. 2268]), this limitation has been characterized as "predicated upon the implications of the commerce clause itself, [citations], or upon the presumed intention of Congress, where Congress has not spoken, [citations]." (*Southern Pacific Co. v. Arizona* (1945) 325 U.S. 761, 768 [89 L.Ed. 1915, 65 S.Ct. 1515].) Consequently, where Congress has spoken and specifically authorized the state or local government action, the dormant commerce clause does not apply. (*White v. Mass. Council of Constr. Employers* (1983) 460 U.S. 204, 213 [75 L.Ed.2d 1, 103 S.Ct. 1042] (*White*).)

The threshold question is whether Ordinance G-6638 is subject to analysis under the dormant commerce clause.[72] This question will be answered in the

---

[72] The parties did not address this threshold question in their initial briefs, but followed the approach used by others in analyzing the validity of local sewage sludge regulation. For example, the parties in a case involving a ban on biosolids application by a county in Virginia appear to have assumed the dormant commerce clause applied and argued whether the sewage sludge ordinance violated a particular test. (*Welch v. Bd. of Sup'rs of Rappahannock County, Va.* (W.D.Va. 1995) 888 F.Supp. 753, 758 (*Welch*); see *Synagro-WWT, Inc. v. Rush Tp., Penn.* (M.D.Pa. 2002) 204 F.Supp.2d 827, 842–843 [allegations sufficient to state a claim under two-tiered analysis applied to violations of dormant commerce clause]; Goldfarb, *Sewage Sludge, supra,* 26 B.C. Envtl. Aff. L.Rev. at pp. 718–727 [discussion of dormant commerce clause does not address whether enactment of Clean Water Act restricts or eliminates application of dormant commerce clause to local sewage sludge regulations]; Harrison & Eaton, *The Role of Municipalities in Regulating the Land Application of Sewage Sludges and*

affirmative if (1) an article of commerce is involved and (2) Congress did not specifically authorize the adoption of such an ordinance.

## B. *Article of Commerce*

 The United States Supreme Court has held that the processing and disposal of solid waste in landfills is an article of commerce. (*C & A Carbone, Inc. v. Clarkstown* (1994) 511 U.S. 383, 391 [128 L.Ed.2d 399, 114 S.Ct. 1677]; see *Philadelphia v. New Jersey* (1978) 437 U.S. 617, 628 [57 L.Ed.2d 475, 98 S.Ct. 2531]; Nowak & Rotunda, Constitutional Law (5th ed. 1995) § 8.8, pp. 299–300 [out-of-state buyers purchased space in landfill, waste was not purchased]; but see Cox, *Burying Misconceptions About Trash and Commerce: Why It Is Time to Dump Philadelphia v. New Jersey* (1991) 20 Cap. U. L.Rev. 813, 829 [trash is not a commodity but a regulated stream to which the commerce clause should not apply].) Sewage sludge differs from solid waste in that economic benefits are realized by farmers using treated sewage sludge as a fertilizer. This difference creates a stronger case for concluding that an article of commerce is involved in transactions concerning the use of sewage sludge on agricultural land. Accordingly, based on the strength of the analogy to solid waste and the commercial value resulting from the application of treated sewage sludge to land, we conclude that the land application of sewage sludge is an article of commerce for purposes of the commerce clause.

## C. *Congress Authorized Local Sewage Sludge Ordinances*

Congress has not been silent on the issue of local regulation of the land application of sewage sludge. Specifically, the Clean Water Act authorizes some degree of local control over the use and disposal of sewage sludge so long as federal regulatory standards are met: "The determination of the manner of disposal or use of sludge is a local determination, except that it shall be unlawful for any person to dispose of sludge from a publicly owned treatment works or any other treatment works treating domestic sewage for any use for which regulations have been established pursuant to subsection (d) of this section, except in accordance with such regulations." (33 U.S.C.A. § 1345(e).)

The regulations of the EPA reiterate this aspect of local control: "Nothing in this part precludes a State or political subdivision thereof . . . from imposing requirements for the use or disposal of sewage sludge more

---

*Septage* (2001) 41 Nat. Resources J. 77, 112–115 [overview of commerce clause does not address threshold question].) Accordingly, this court requested supplement briefing on this threshold question. (See Gov. Code, § 68081.)

stringent than the requirements in this part or from imposing additional requirements for the use or disposal of sewage sludge." (40 C.F.R. § 503.5(b) (2005).)

 The foregoing statutory and regulatory language must be examined to determine if Congress affirmatively permitted the adoption of a local ordinance like Ordinance G-6638. (*White, supra,* 460 U.S. at p. 213 [applicable federal statute and regulations examined to determine if they authorized City of Boston's requirement that construction contracts it entered must be with firms that hire half or more of their workers from Boston].) "Where state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce. *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 769 [89 L.Ed. 1915, 65 S.Ct. 1515] (1945)." (*Ibid.*) As the United States Supreme Court has noted, however, "for a state regulation to be removed from the reach of the dormant Commerce Clause, congressional intent must be unmistakably clear." (*South-Central Timber Dev. v. Wunnicke* (1984) 467 U.S. 82, 91 [81 L.Ed.2d 71, 104 S.Ct. 2237].)

 It is unmistakably clear that Congress intended "the manner of disposal or use of sludge [to be] a local determination" so long as minimum federal standards were met. (33 U.S.C.A. § 1345(e).) It is equally clear that the restriction in Ordinance G-6638—that only sewage sludge meeting the heightened treatment standards can be applied to land in Kern County—reflects a local determination of the manner of disposal or use of sewage sludge.[73] Thus, the heightened treatment standards are the type of local regulation expressly authorized by the Clean Water Act. (Cf. *Welch, supra,* 888 F.Supp. at p. 760 [ordinance banning the land application of sewage sludge permissible under Clean Water Act].) Because Congress authorized a local ban on the land application of sewage sludge (*Welch, supra,* at pp. 757–758), one can strongly infer that Congress also authorized local governments to impose a lesser burden on commerce such as the heightened treatment standards in Kern Code provision 8.05.040(A), Ordinance G-6638. (See *Posadas de Puerto Rico Assoc. v. Tourism Co.* (1986) 478 U.S. 328, 345–346 [92 L.Ed.2d 266, 106 S.Ct. 2968] [the greater power to ban an activity necessarily includes the lesser power to impose conditions on the activity].)

In light of the foregoing, plaintiffs' assertion that Ordinance G-6638 is a step towards the balkanization of the sewage sludge industry misses the

---

[73] Plaintiffs argue the statutory phrase "local determination" refers only to the decisions made by a wastewater treatment agency and excludes ordinances adopted by land use agencies such as County. We reject this statutory construction because, among other things, it cannot be reconciled with the EPA's regulation concerning local imposition of requirements for the use or disposal of sewage sludge. (See 40 C.F.R. § 503.5(b) (2005).)

mark; the natural consequence of Congress's authorization of local control is variety and inconsistency in the way localities choose to address the subject. What plaintiffs characterize as balkanization is more appropriately characterized as Congress's choosing to exploit one of the strengths of our federal system—its flexibility—by allowing states and localities to (1) experiment with different approaches (see *New State Ice Co. v. Liebmann* (1932) 285 U.S. 262, 311 [76 L.Ed. 747, 52 S.Ct. 371] (dis. opn. of Brandeis, J.) [describing states as laboratories that can experiment with different laws]), subject to the minimum national standard contained in Part 503, and (2) adapt their regulations to local conditions, such as geography, climate, soil types and population density.

### D. *Discrimination Against Interstate Commerce*

Plaintiffs contend, however, that although Congress has authorized some local determinations concerning the land application of sewage sludge, it has not expressly authorized ordinances that discriminate against interstate commerce. (Cf. *White, supra,* 460 U.S. at p. 213 [federal program authorized local favoritism in hiring construction workers as a means for economic revitalization and providing opportunities for the poor, minorities, and unemployed].) We will address this contention by considering whether the Clean Water Act authorized discriminatory local ordinances and, if not, whether Ordinance G-6638 discriminates against interstate commerce.

### 1. *The Clean Water Act does not authorize discrimination*

The Clean Water Act does not explicitly authorize local governmental units to discriminate against sewage sludge that arrives in a state through interstate commerce. (See 33 U.S.C.A. § 1345(e).) Nor is there anything in the statutory language that gives rise to a reasonable inference that Congress intended such a result. Also, County has cited no legislative history revealing such a Congressional intent. Thus, County has failed to establish that Congress demonstrated an unmistakably clear intent to allow discriminatory state regulation of the land application of sewage sludge. (See *South-Central Timber Dev. v. Wunnicke, supra,* 467 U.S. at p. 91.) Consequently, any discriminatory aspect of a local ordinance regulating the land application of sewage sludge is still subject to scrutiny under the limitation imposed on discrimination by the dormant commerce clause.

### 2. *Ordinance G-6638 is not facially discriminatory*

Unless Congress has provided otherwise, an ordinance that discriminates against interstate commerce, as opposed to one that regulates evenhandedly, is virtually always invalid under the dormant commerce clause. (*Oregon*

*Waste Systems v. Dept. of Env. Quality* (1994) 511 U.S. 93, 99 [128 L.Ed.2d 13, 114 S.Ct. 1345] [landfill disposal fees imposed by Oregon statute were higher for waste generated in other states than for waste generated in Oregon and, thus, were facially discriminatory and invalid].) In this context, discrimination means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." (*Ibid.*)

Ordinance G-6638 does not on its face discriminate against interstate commerce, because its provisions apply to the land application of all sewage sludge regardless of its geographical origin. (See Goldfarb, *Sewage Sludge, supra,* 26 B.C. Envtl. Aff. L.Rev. at p. 722 ["local ordinance upheld in *Welch* banned all land application of sewage sludge, not just sewage sludge generated out-of-state"].) Consequently, Ordinance G-6638 is distinguishable from a Michigan statute that violated the dormant commerce clause by creating separate categories for in-county and out-of-county solid waste. (*Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Resources* (1992) 504 U.S. 353 [119 L.Ed.2d 139, 112 S.Ct. 2019]; see *Philadelphia v. New Jersey, supra,* 437 U.S. at p. 624 [New Jersey's prohibition on the importation of solid waste unconstitutional].)

### 3. *Ordinance G-6638 is not discriminatory in effect*

In addition to facial discrimination, an ordinance may be discriminatory "in practical effect." (*Hughes v. Oklahoma* (1979) 441 U.S. 322, 336 [60 L.Ed.2d 250, 99 S.Ct. 1727].) Plaintiffs' claim of discrimination in practical effect is based on an incorrect comparison of the impacts of different regulations, rather than different impacts caused by the challenged ordinance. Plaintiffs compare (a) the effect of the ordinance within the geographical area that comprises the jurisdiction of County to (b) the effect of other regulations, or the lack of regulations, applicable to the incorporated areas of Kern County. The incorporated areas of Kern County are necessarily outside the jurisdiction and authority of County; County's authority extends only to the unincorporated areas within its borders. (See Cal. Const., art. XI, § 7 ["A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws"]; *City of Dublin v. County of Alameda* (1993) 14 Cal.App.4th 264, 274–275 [17 Cal.Rptr.2d 845] [only unincorporated area of a county is "within its limits"].) Therefore, the correct comparison is between the impact of the ordinance on sewage sludge generated outside the jurisdictional authority of County and the impact on sewage sludge generated within that area. (See *Associated Industries of Missouri v. Lohman* (1994) 511 U.S. 641, 650 [128 L.Ed.2d 639, 114 S.Ct. 1815] ["discrimination is appropriately assessed with reference to the specific subdivision in which applicable laws reveal differential treatment"].) In this case, the ordinance's burden on the sewage sludge

industry is the same without regard to the place of origin of the sewage sludge. Sewage sludge, regardless of whether it originates in Kern County, other counties in California, or out of state must be treated to the same standards before it is allowed to be applied to land in the unincorporated areas of Kern County.

Plaintiffs stated at oral argument that discrimination in practical effect occurred because no in-county producer of sewage sludge needed access to land within the unincorporated area of Kern County to dispose of its sewage sludge. This argument is rejected because it is factually inaccurate. The administrative record contains a letter from the City of Shafter indicating that it had applied biosolids from its treatment plant to neighboring agricultural land that was in the unincorporated area of Kern County.

Consequently, plaintiffs have failed to meet their burden of showing that the ordinance, in practical effect, treats out-of-state economic interests[74] differently than in-state economic interests. (See *Pacific Merchant Shipping Assn. v. Voss* (1995) 12 Cal.4th 503, 517 [48 Cal.Rptr.2d 582, 907 P.2d 430] [party raising commerce clause challenge has burden of showing discrimination].) In other words, plaintiffs have failed to show that Ordinance G-6638 causes an out-of-county producer of sewage sludge to be at a disadvantage to an in-county producer of sewage sludge in the competition among those producers to acquire the right to place their sewage sludge on agricultural land located in the unincorporated areas of Kern County.[75]

Plaintiffs condemn Ordinance G-6638 as illegitimate economic protectionism prohibited by the commerce clause. But the possibility that the reputation of agricultural produce from Kern County benefited from the enactment of Ordinance G-6638 is not enough to violate the commerce clause. First, Ordinance G-6638 still falls within the scope of what Congress authorized. Second, the possibility that consumers might view Kern County produce more favorably does not render the ordinance discriminatory against interstate commerce from the perspective of (1) in-county farmers who are selling sewage sludge disposal services and applying biosolids to their land in the unincorporated areas of Kern County or (2) the producers of sewage sludge, regardless of their location, that are buying sewage sludge disposal services. RBM focuses on the farmers who applied Class B biosolids and argues

---

[74] If Ordinance G-6638 were shown to discriminate against out-of-county interests, that discrimination, by definition, would include discrimination against out-of-state interests. (See *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Resources, supra,* 504 U.S. 353.) Thus, even though the record does not show any sewage sludge originating outside California was ever shipped to Kern County, we will treat plaintiffs' arguments as implicating interstate commerce.

[75] This lack of discrimination also means the heightened treatment standards do not violate the equal protection clause.

Ordinance G-6638 had the practical effect of discriminating against them for the benefit of farmers who claimed the reputation of their products was harmed by allowing the land application of Class B biosolids in Kern County. This theory of discrimination and protectionism fails because all in-county farmers are subject to the same practical effect of Ordinance G-6638—they can no longer apply Class B biosolids to their land. Furthermore, this result was not achieved at the expense of out-of-state competition. (See *Hunt v. Washington Apple Advertising Comm'n* (1977) 432 U.S. 333 [53 L.Ed.2d 383, 97 S.Ct. 2434] [out-of-state competition improperly discriminated against by North Carolina statute that prohibited sale of closed apple containers displaying another state's grading classification]; see also *Oregon Waste Systems v. Dept. of Env. Quality, supra,* 511 U.S. at pp. 106–107.)

### E. Burden on Interstate Commerce

As we have stated, though the Clean Water Act does not authorize discrimination against interstate commerce, it does explicitly authorize local governmental entities to regulate the land application of sewage sludge. Because Congress has specifically and unmistakably authorized nondiscriminatory local ordinances like Ordinance G-6638, our analysis of the dormant commerce clause need not consider "whether the ordinance imposes a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits,' *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 [25 L.Ed.2d 174, 90 S.Ct. 844] (1970)." (*C & A Carbone, Inc. v. Clarkstown, supra,* 511 U.S. at p. 390.) Application of the *Pike* test is inappropriate in this case because the enactment of the Clean Water Act reflects a determination by Congress that local regulation is appropriate, which necessarily implies that localities have a legitimate purpose in regulating the use and disposal of sewage sludge within their jurisdictional boundaries and that the local benefits from such a regulation outweigh any nondiscriminatory burdens on interstate commerce that might result.

### V. California Constitutional Limitations on Exercise of Police Power

Plaintiffs contend that the Kern County Board of Supervisors failed to consider the effect of the ordinance on surrounding areas beyond the borders of Kern County, and that this failure renders the ordinance a defective exercise of the police powers granted to County by the California Constitution. (See Cal. Const., art. XI, § 7 ["A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws"].)

The California Supreme Court has identified the standard for determining whether the adoption of a land use restriction is a valid exercise of the

police power granted under the California Constitution. An ordinance is valid "if it is fairly debatable that the [land use] restriction in fact bears a reasonable relation to the general welfare." (*Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 601 [135 Cal.Rptr. 41, 557 P.2d 473].) The "general welfare" that must be considered may extend beyond the geographical limits of the local governmental entity adopting the ordinance. "[I]f a restriction significantly affects residents of surrounding communities, the constitutionality of the restriction must be measured by its impact not only upon the welfare of the enacting community, but upon the welfare of the surrounding region." (*Ibid.*)

In ruling against the plaintiffs on this claim, the superior court stated "that OCSD has not presented any evidence of the impact on the entire region as is required pursuant to *Associated Home Builders* . . . ." The superior court observed that the administrative record did not contain a study of the ordinance's regional impact and found OCSD was collaterally estopped from raising the issue again because it had already been presented in the CEQA portion of the lawsuit.

We previously held that the imposition of heightened treatment standards in Kern Code provision 8.05.040(A), Ordinance G-6638, was not valid under CEQA. An EIR should have been prepared because plaintiffs presented substantial evidence to support a fair argument that the heightened treatment standards might have a significant effect on the environment, including effects occurring outside Kern County. (See part II.A., *ante.*) Assuming for purposes of argument that County exceeded the limitations imposed by the California Constitution on the exercise of police power when it adopted Ordinance G-6638, the preparation of the EIR required by this decision would have the effect of addressing the alleged failure to consider the general welfare outside Kern County. Therefore, we need not rule separately on this constitutional challenge to the heightened treatment standards.

VI. *The Biosolids Impact Fee Violates Vehicle Code Section 9400.8*

Vehicle Code section 9400.8 provides in pertinent part: "Notwithstanding any other provision of law, . . . no local agency may impose a tax, permit fee, or other charge for the privilege of using its streets or highways, other than a permit fee for extra legal loads, after December 31, 1990, unless the local agency had imposed the fee prior to June 1, 1989."[76]

---

[76] This statutory provision became operative because voters approved Senate Constitutional Amendment No. 1 of the 1989–1990 Regular Session (Prop. 111) at the June 5, 1990, primary election. (See *San Francisco Taxpayers Assn. v. Board of Supervisors* (1992) 2 Cal.4th 571, 583, fn. 13 [7 Cal.Rptr.2d 245, 828 P.2d 147].)

In moving for summary adjudication of issues, OCSD asserted that the biosolids impact fee was invalid because it was barred by Vehicle Code section 9400.8. The superior court denied summary adjudication and ruled "[t]his issue was not raised by OCSD's pleadings and the pleadings control. Pleadings must give notice of the claim. [Citation.]" OCSD raised the issue again at trial and requested leave to amend its complaint. The superior court denied this request and stated that "[a]mendment at this time would be unduly prejudicial to . . . County."

Plaintiffs contend that the complaint raised the preemption issue, although it did not specifically reference Vehicle Code section 9400.8, and that the superior court's refusal to consider the issue at the motion for summary adjudication or at trial was a prejudicial abuse of discretion. County argues that plaintiffs' claim is procedurally defective because they did not exhaust their administrative remedies and failed to file a timely motion to amend their complaint. County also asserts that the biosolids impact fee imposed by the ordinance is a bona fide impact fee and not a fee for the privilege of using the streets and highways in Kern County.[77]

 We independently review issues of statutory construction and the application of that construction to a set of undisputed facts as questions of law. (*Twedt v. Franklin* (2003) 109 Cal.App.4th 413, 417 [134 Cal.Rptr.2d 740].)

### A. *Exhaustion Doctrine*

County asserts that plaintiffs did not raise Vehicle Code section 9400.8 during the administrative proceedings and, as a result, "are barred by the exhaustion doctrine from seeking judicial review of this claim. (*Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1197–1198 [200 Cal.Rptr. 855].)"

*Coalition for Student Action v. City of Fullerton* did not involve a claim that a local ordinance was preempted by a state statute. (See *Coalition for Student Action v. City of Fullerton, supra*, 153 Cal.App.3d 1194.) In that case, the plaintiffs failed to assert CEQA violations at the administrative level and then sought to set aside approval of construction plans based on alleged violations of CEQA. The superior court denied their petition for a writ of mandate based on the failure to exhaust administrative remedies, and the Court of Appeal affirmed. (*Id.* at p. 1198.)

---

[77] The provisions of Ordinance G-6638 relevant to the biosolids impact fee are contained in Kern Code provisions 8.05.020(F) and 8.05.030(H), which expired on December 31, 2002. (See FACTS AND PROCEEDINGS, *ante.*)

Alleged violations of CEQA are distinguishable from alleged violations of Vehicle Code section 9400.8 because (1) CEQA expressly requires the exhaustion of administrative remedies (§ 21177; see Remy, Guide to CEQA, *supra*, pp. 578–588 [exhaustion of administrative remedies]) and (2) compliance with CEQA is first determined by a public agency rather than the courts. In contrast, a claim that an ordinance violates Vehicle Code section 9400.8 is not given to the exclusive jurisdiction of a county's board of supervisors. (See *Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 390–391 [6 Cal.Rptr.2d 487, 826 P.2d 730] [exhaustion doctrine applies where an agency alone has jurisdiction over a case].) In asserting its theory of exhaustion, County has not shown that there was an available administrative procedure for asserting the ordinance violated the prohibition contained in Vehicle Code section 9400.8. (See *People v. Beaumont Inv., Ltd.* (2003) 111 Cal.App.4th 102, 125 [3 Cal.Rptr.3d 429] [exhaustion doctrine does not apply in the absence of an available administrative remedy].) The coincidental existence of a CEQA administrative procedure did not confer exclusive jurisdiction over the preemption challenge on the Kern County Board of Supervisors, or require the preemption challenge to be raised in the CEQA proceeding, before a court could obtain jurisdiction over such a challenge.

■ Accordingly, we hold that the doctrine of exhaustion of administrative remedies does not apply to the claim that the biosolids impact fee imposed by the ordinance is preempted by Vehicle Code section 9400.8.

B. *Mitigation Fee Act Does Not Apply to the Biosolids Impact Fee*

County asserts that the biosolids impact fee was adopted by County pursuant to the Mitigation Fee Act, Government Code section 66000 et seq. and therefore the prohibition in Vehicle Code section 9400.8 does not apply.

■ We do not address the issues of statutory construction raised in connection with the Mitigation Fee Act in detail because the prohibition on certain fees contained in Vehicle Code section 9400.8 is not overridden by the Mitigation Fee Act. Vehicle Code section 9400.8 expressly states that its prohibition applies "[n]otwithstanding any other provision of law." The Mitigation Fee Act was in effect at the time Vehicle Code section 9400.8 became operative and thus was among the other provisions of law covered by the quoted phrase. In short, despite the existence of the Mitigation Fee Act, a local agency may not impose a charge for the privilege of using its streets and highways.

C. *Prejudice and Leave to Amend to Reference Specific Code Section*

■ The superior court found that allowing plaintiffs to amend their pleadings to assert a violation of Vehicle Code section 9400.8 would prejudice County. This finding is not supported by any evidence. Indeed, County

did not even assert it experienced prejudice in its trial brief, reply trial brief, or appellate brief. "A pleading may be amended at the time of trial unless the adverse party can establish prejudice. [Citation.] Where a party is allowed to prove facts to establish one cause of action, an amendment which would allow the same facts to establish another cause of action is favored, and a trial court abuses its discretion by prohibiting such an amendment when it would not prejudice another party. [Citations.] A variance between pleading and proof does not justify the denial of an amendment to conform pleading to proof unless the unamended pleading 'misled the adverse party to his prejudice in maintaining his action or defense upon the merits.' [Citations.]" (*Brady v. Elixir Industries* (1987) 196 Cal.App.3d 1299, 1303 [242 Cal.Rptr. 324], overruled on another ground in *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1248–1251 [32 Cal.Rptr.2d 223, 876 P.2d 1022].)

 As a general rule, where the evidence to support the cause of action in the amendment is already before the court, the opposing party will not experience prejudice if the amendment is allowed. (See Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2004) ¶ 12:394, p. 12-79 (rev. # 1, 2004).) In this case, the general rule applies because the evidence relied upon by plaintiffs was contained in the administrative record and was discussed before the superior court in connection with the constitutional challenges raised against the biosolids impact fee. In addition, County has not shown that the lack of a specific reference to Vehicle Code section 9400.8 in the complaint misled it in the presentation of its defense, either in terms of the evidence it would have produced or in a manner not related to evidence. Thus, County has not shown that this situation falls within an exception to the general rule. Accordingly, we conclude that plaintiffs should have been allowed to assert that the biosolids impact fee was prohibited by Vehicle Code section 9400.8.

### D. *Vehicle Code Section 9400.8 Preempts the Biosolids Impact Fee*

The general principles governing state law preemption of a local ordinance were set forth by the California Supreme Court in *Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893 [16 Cal.Rptr.2d 215, 844 P.2d 534] as follows:

 " 'If otherwise valid local legislation conflicts with state law, it is preempted by such law and is void.' [Citations.] [¶] 'A conflict exists if the local legislation " 'duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication.' " ' [Citations.] [¶] Local legislation is 'duplicative' of general law when it is coextensive therewith. [Citation.]

"Similarly, local legislation is 'contradictory' to general law when it is inimical thereto. [Citation.]

"Finally, local legislation enters an area that is 'fully occupied' by general law when the Legislature has expressly manifested its intent to 'fully occupy' the area [citation], or when it has impliedly done so in light of one of the following indicia of intent: '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the' locality. [Citations.]" (*Sherwin-Williams Co. v. City of Los Angeles, supra,* 4 Cal.4th at pp. 897–898.)

By adopting Vehicle Code section 9400.8, the Legislature expressly prohibited a county from "impos[ing] a tax, permit fee, or other charge for the privilege of using its streets or highways, other than a permit fee for extra legal loads . . . ." (*Ibid.*) This language raises two questions of statutory construction. First, was the biosolids impact fee a "tax, permit fee, or other charge"? Second, do fees "for the privilege of using its streets or highways"[78] include fees designed to cover damage resulting from the use of a county's roads?

County does not argue that the biosolids impact fee was not a "permit fee or other charge" for purposes of Vehicle Code section 9400.8. The parties' dispute focuses on the second issue. County specifically argues the fee was not for road use, but was a bona fide impact fee: "The fee is imposed only on permittees to recover the costs for repairing damage or upgrading county roads due to the incremental increase in truck traffic transporting biosolids to be land applied in Kern County."

In describing the underlying basis for the fee, County states in its appellate brief that it "commissioned an engineering firm to determine the condition of local roads used for biosolids transport, the volume of traffic attributable to trucks hauling biosolids on . . . those roads, and the estimated cost of maintaining the roads in their current condition. [Citation.] The study specifically identified the roads affected, the length of the road segments, the required thickness of paving overlay needed to maintain them, and the price

---

[78] "Highway" and "street" are both defined as "a way or place of whatever nature, publicly maintained and open to the use of the public for purposes of vehicular travel." (Veh. Code, §§ 360, 590.)

of the required materials. [Citation.] Based on this information, . . . County determined the amount of the fee needed to pay the estimated cost of the required maintenance. [Citation.]"

County explicitly argues that a fee for the privilege of using its roads is distinguishable from a fee "for mitigating the impacts to the . . . County infrastructure shown to be caused by the transport of Biosolids." (Ordinance G-6638, Kern Code provision 8.05.020(F) [definition of biosolids impact fee].) Whether such a distinction should be recognized is a matter of statutory construction.

A reviewing court's fundamental task in determining the meaning of a statute "is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. [Citation.]" (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) The analysis starts with an examination of the actual words of the statute, giving them their usual, ordinary meaning. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476 [66 Cal.Rptr.2d 319, 940 P.2d 906].) A court may refer to the definitions contained in a dictionary to obtain the usual and ordinary meaning of a word. (*Martinez v. Enterprise Rent-A-Car Co.* (2004) 119 Cal.App.4th 46, 54, fn. 3 [13 Cal.Rptr.3d 857].)

Webster's Third New International Dictionary (1986), page 2524, states the verb "use" "is general and indicates any putting to service of a thing, usu. for an intended or fit purpose . . . ." This definition is quite broad because it covers "*any* putting to service" (italics added). If the Legislature employed the literal meaning of this definition, then the "privilege of using" a road would cover the privilege of putting that road to service. Because trucks hauling loads within the legal weight limit are putting to service the roads over which they travel and they have the privilege of traveling over those roads as a result of being properly licensed and registered, it follows that a literal reading of the phrase the "the privilege of using [a county's] streets or highways" includes driving a truck on a road even if it causes incremental damage to the road. In other words, a road maintenance or impact fee is simply one type of fee for the privilege of using a road.

Before adopting the literal meaning of the word "using," we must check the resulting statutory construction to determine if it comports with, or frustrates, the purpose of the statutory scheme. (See *Torres v. Automobile Club of So. California* (1997) 15 Cal.4th 771, 777 [63 Cal.Rptr.2d 859, 937 P.2d 290] [statutory language must be construed in context by referring to the nature and purpose of the statutory scheme as a whole]; *Select Base Materials, Inc. v. Board of Equalization* (1959) 51 Cal.2d 640, 645 [335 P.2d 672] [legislative purpose will not be sacrificed to a literal construction].)

First, neither Vehicle Code section 9400.8 nor the remainder of article 3 of chapter 6 of division 3 of the Vehicle Code—which addresses weight fees assessed at vehicle registration—contains an express exception for local fees or charges that attempt to recover damage to streets or highways caused by vehicle use.

Second, such an exception cannot be implied. Vehicle Code section 9400.8 expressly creates an exception for "extra legal loads" and authorizes local agencies to collect a permit fee for those types of loads. Because the exception for extra legal loads shows the Legislature was capable of expressing its intent to except certain uses, it creates the inference that the Legislature did not intend any exceptions that were not expressly stated. (See Code Civ. Proc., § 1858 [judge may not insert what Legislature has omitted]; see *Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1230 [32 Cal.Rptr.2d 19, 876 P.2d 505] [express statutory exemptions generally preclude implied exemptions].)

Third, Vehicle Code section 9400.8 is part of article 3 of chapter 6 of division 3 of the Vehicle Code. Division 3 concerns the registration of vehicles and certificates of title. Chapter 6 addresses registration and weight fees. Article 3, which includes Vehicle Code sections 9400 through 9410, concerns weight fees. For example, subdivision (b) of Vehicle Code section 9400 sets forth registration fees based on unladen weight for commercial motor vehicles with not more than two axles, and subdivision (c) does the same for commercial motor vehicles with three or more axles and certain trailers and dollies.[79] Thus, it appears that Vehicle Code section 9400.8 is part of a statutory scheme that regulates fees based on vehicle weight.[80] This statutory scheme as set forth in article 3 of chapter 6 of division 3 of the Vehicle Code, and the Legislature's statement in the legislation that added section 9400.8 to the Vehicle Code that "[n]othing in this act shall be construed to allow local governments to impose fees not otherwise authorized by statute" (Stats. 1989, ch. 1337, § 4, p. 5498), support the conclusion that the Legislature intended to fully occupy the field of fees related to the weight of vehicles carrying legal loads.

---

[79] Vehicle Code section 9400.1 became effective on September 29, 2000, and sets forth a range of fees based on gross vehicle weight for commercial motor vehicles with declared gross vehicle weight of 10,001 pounds or more. (Stats. 2000, ch. 861, § 50.)

[80] The commercial weight fees collected under this statutory scheme are deposited with the State Treasurer, who, on order of the Controller, shall deposit the money in the State Highway Account in the State Transportation Fund. (Veh. Code, § 42205, subd. (a).) Funds from the commercial weight fee not used to cover the administration costs related to the fee may be appropriated by the Legislature to various uses including the maintenance and construction of public streets and highways. (Veh. Code, § 42205, subd. (b); see Cal. Const., art. XIX, §§ 1, 2.)

In opposition to the foregoing reasoning, County has cited no case law, legislative history, published legal opinion of the Attorney General, treatise, article or other authority that adopts or endorses the distinction between fees for the privilege of using roads and fees that recover damages caused by a specific type of road use. Nor has County offered an explanation as to how such a distinction would further the purpose of the statutory scheme. In other words, County has not shown the Legislature intended to allow local agencies to charge fees for road use that causes incremental damage to the roads.

 Accordingly, Vehicle Code section 9400.8 must be construed to prohibit a local agency from imposing fees or charges on legal loads that are hauled on its roads, even though hauling such loads may cause damage beyond minor wear and tear to the roads.

The final step of our analysis is to determine if the biosolids impact fee was in fact the type of fee prohibited by Vehicle Code section 9400.8. This is necessary because, on its face, the biosolids impact fee was not assessed on miles driven on roads. Instead, the biosolids impact fee was assessed primarily on tons of Class B biosolids applied to land in the unincorporated areas of Kern County. Although this basis of assessment is attenuated from actual road use, that attenuation is insufficient to save the entire biosolids impact fee. The undisputed facts in the administrative record establish that the per-ton amount of the biosolids impact fee was derived from (1) the miles of Kern County roads used in the hauling of biosolids,[81] (2) the quality of those roads,[82] (3) an estimate of the total weight of Class B biosolids that would be hauled before the January 1, 2003, deadline, (4) the load and volume of nonbiosolid traffic experienced by the road segments, and (5) the amount of load and volume of traffic added to each road segment by the transport of biosolids. The funds generated by the biosolids impact fee were to be used to maintain and repair roads and correct any other "infrastructure deficiencies directly associated with the hauling of Biosolids" (Ordinance G-6638, Kern Code provision 8.05.030(H)(3)), but also were available for other purposes not related to roads and other infrastructure.

 The way County calculated the biosolids impact fee and the way funds generated could be applied leads inescapably to the conclusion that the fee was, at least in part, a fee imposed on road use. This conclusion is reinforced by the exception in Kern Code provision 8.05.03(H)(1), Ordinance G-6638,

---

[81] An inventory of those roads established their total length at 153.5 miles.

[82] The roads were classified into three categories. According to the biosolids staff report dated October 5, 1999, issued by the County Resource Management Agency, category 3 roads were designed for heavy truck traffic and, as a result, "[t]he increased truck traffic due to the biosolids transport [would] not have any noticeable effect on the structural integrity of these roads."

that allows a waiver of the fee "[w]here the Permitee can demonstrate the land application of Biosolids does not have an impact on County infrastructure or roads." Because the primary purpose of the biosolids impact fee was to collect funds based on the use of streets or highways located in Kern County, it violated Vehicle Code section 9400.8.

E. *Remedy*

Although the primary purpose of the biosolids impact fee was to pay for road repair and maintenance, that was not its exclusive purpose. Kern Code provision 8.05.030(H)(3), Ordinance G-6638, was in effect from January 1, 2000, through December 31, 2002, and stated that the money generated by the biosolids impact fee and other permit fees would be available to fund a number of different uses, some of which were not related to the impact of hauling biosolids over County roads.

Because of these multiple purposes, we asked OCSD and County to submit supplemental letter briefs on the issue of what relief is appropriate when an ordinance imposes a fee for more than one purpose and one of the purposes conflicts with a statute and other purposes do not. We asked OCSD and County whether the superior court should be directed to (1) uphold the entire biosolids impact fee, (2) invalidate the entire fee, or (3) determine what portion of the fee, if any, was or will be used for purposes not contrary to Vehicle Code section 9400.8 and allow that portion to stand.

The first alternative—upholding the entire fee based on the existence of some potentially valid uses of the funds generated by that fee—is not appropriate because such a remedy would allow public agencies to adopt fees with illegal purposes and save those fees from invalidation by appending one valid purpose for which the fees could be used. Thus, when a fee has both valid and invalid purposes, the entire fee cannot be upheld as valid.

Conversely, it would be unduly harsh to completely invalidate a fee when part of the funds would be used for proper purposes and the formula by which the fee is calculated—in this case, tons of biosolids applied to the unincorporated areas of Kern County—does not itself run afoul of a statutory prohibition.[83]

■ Accordingly, we hold the appropriate relief when a fee is imposed for both valid and invalid purposes is to uphold the fee to the extent that the funds generated are applied to valid purposes and those purposes are otherwise severable from the invalid ones. (See *Williams Communications v. City*

---

[83] A stronger argument for invalidating the entire fee might exist if the formula by which the fee is applied to the public were itself contrary to a statute.

*of Riverside* (2003) 114 Cal.App.4th 642, 656–660 [8 Cal.Rptr.3d 96] [unlawful portion of school facilities fee imposed on developer ordered refunded under Gov. Code, § 66020, subd. (e)].)[84]

In this case, Ordinance G-6638 expressly stated that (1) the invalidity of any of its provisions would not affect the validity of its other provisions and (2) its provisions were severable. (See *City and County of San Francisco v. Flying Dutchman Park, Inc.* (2004) 122 Cal.App.4th 74, 79 [18 Cal.Rptr.3d 532] [illegal allocation did not require invalidation of entire parking tax ordinance or reduction of parking tax arrearages because offending clause was severable under ordinance's savings clause].) Furthermore, the rate used to determine the biosolids impact fee as well as the funds generated by the fee are inherently divisible, at least down to the penny. We conclude that the appropriate relief is to invalidate the biosolids impact fee to the extent it was or will be used for purposes that violated Vehicle Code section 9400.8.

OCSD contends this court should direct the superior court to invalidate the entire biosolids impact fee and order a refund of that fee with interest. Recognizing that Kern Code provision 8.05.030(H)(3), Ordinance G-6638, created the possibility of valid purposes mixed with invalid purposes, OCSD asserts: "To the extent that . . . 8.05.030(H)(3) could be read as authorizing the use of biosolids impact fees for property inspections or the GIS tracking system, then the annual permit fee would have to be reduced and the overpayment would have to be refunded—the County cannot recover the same cost twice."

OCSD's assertion is based on the factual premise that the annual permit fees collected were sufficient to pay for all of the valid uses and, therefore, the funds generated by the biosolids impact fee were not needed, and will not be budgeted, for valid uses. We are unable to confirm this factual premise based on the current appellate record.

Relief in the form of apportionment or allocation between valid and invalid purposes cannot be granted without further findings of fact. Therefore, this matter will be remanded to the superior court for further proceedings to consider how the funds generated by the biosolids impact fee were spent or will be spent and how to separate the valid applications of funds, if any, from the invalid applications.[85]

---

[84] Government Code section 66020 is not applicable to the biosolids impact fee, but it provides a useful analogy for determining the appropriate relief in this case.

[85] Deciding these broad questions may involve the consideration of a wide variety of specific factual and legal issues. For example, if the terms of section 3 of Ordinance G-6638, Kern Code provision 8.05.040(M) are construed to allow the biosolids impact fee to be used to pay costs and expenses incurred in "enforcement activities," then funds from the biosolids

Because of the relief that will be granted on remand, we need not address the claims that the biosolids impact fee violated the equal protection clause of the United States Constitution and constituted an illegal general or special tax. (See fn. 37, *ante*; see also *Waters-Pierce Oil Co. v. City of Hot Springs* (1908) 85 Ark. 509 [109 S.W. 293] [taxing vehicles differently based on contents—petroleum products, ice or other—instead of capacity and size unconstitutional].) On one hand, if all or a portion of the biosolids impact fee is invalidated under Vehicle Code section 9400.8, then addressing other grounds of invalidity would be redundant. On the other hand, if all or a portion of the biosolids impact fee was or will be allocated to expenditures specifically related to County's biosolids regulatory program, then a rational basis exists for imposing a per ton fee on Class B biosolids and not imposing a per ton fee on other materials carried by truck. The existence of a rational basis for distinguishing between biosolids and other materials means the distinction does not violate equal protection. (See *Genesis Environmental Services v. San Joaquin Valley Unified Air Pollution Control Dist.* (2003) 113 Cal.App.4th 597, 605 [6 Cal.Rptr.3d 574] [equal protection claims are based on the lack of a rational basis for treating similarly situated persons differently].) Similarly, funds allocated to valid uses do not constitute illegal general or special taxes. (See *City of Dublin v. County of Alameda, supra*, 14 Cal.App.4th 264 [county landfill $6 per ton surcharge valid as a reasonably necessary charge for cost of the program].)

## VII. *County's Cross-action*

County's cross-action alleged that a number of contracts and contract extensions entered by CSDLAC, CLABS, and OCSD relating to the transport and disposal of biosolids were projects for purposes of CEQA, and that some level of CEQA review should have been performed before they were entered. Environmental assessment was required, according to County, because the new contracts and extensions were either separate projects or modifications of prior projects that may have triggered the need for a subsequent EIR, supplemental EIR or subsequent negative declaration.

The superior court ruled against County on all of the causes of action in its cross-action and concluded that (1) some of the actions by the sanitation agencies were covered by program EIR's that did not require additional CEQA documentation, (2) the Central Valley Water Board rather than the sanitation agency was the lead agency for some of the projects, and (3) CEQA review of an option to purchase real estate was premature under the

---

impact fee might appropriately be allocated to cover various amounts expended in connection with *Kern County Environmental Health Services v. Arciero Ranches* (Aug. 9, 2001, F035181) (nonpub. opn.). These issues and others are best addressed in the first instance by the superior court.

provisions of Guidelines section 15004. County appeals from the rulings related to nine contracts.[86]

### A. *Mootness of Expired Contracts and Extensions*

 The termination dates for some of the contracts and extensions have passed since the ruling by the superior court. Consequently, we directed the parties to submit supplemental letter briefs on the question whether County's CEQA challenges to those contracts or extensions are moot. The standard this court applies in determining the mootness of a CEQA appeal is whether any effective relief can be granted the appellant. (*Association for a Cleaner Environment v. Yosemite Community College Dist.*, *supra*, 116 Cal.App.4th 629 [question whether initial study should have been prepared was not moot]; *Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, 888–889 [92 Cal.Rptr.2d 268] [completing and opening car wash project for operations while appeal was pending did not render preparation of EIR moot because modification or removal of project remained possible].)

### 1. *Extension of CSDLAC-Yakima Agreement*

On November 9, 1994, CSDLAC and Yakima Company (Yakima) entered into an agreement for the removal, transportation and reuse of biosolids (Yakima Agreement) pursuant to which biosolids produced at the Carson Plant would be transported to Kern County and applied to a specific site owned and cultivated by the Buttonwillow Land and Cattle Company. The Yakima Agreement required Yakima to (1) obtain all the necessary licenses, permits and other approvals needed to perform the agreement, (2) keep complete records, (3) conduct testing of soil, groundwater and plant tissue, (4) provide CSDLAC access to the site and records for inspection purposes, (5) provide CSDLAC with copies of all regulatory reports, and (6) maintain insurance. Yakima agreed to remove up to 1,000 wet tons of biosolids per week from CSDLAC's treatment plant and was paid $25 per wet ton.

The Yakima Agreement began on November 9, 1994, remained effective for a period of three years, and provided for two 3-year renewal periods upon agreement of Yakima and CSDLAC's chief engineer. Yakima was granted the right to terminate the Yakima Agreement by giving 24 hours' notice if it could no longer legally perform the required services.

In October 1997, CSDLAC and Yakima agreed to the first extension of the Yakima Agreement. Almost two years later, in a letter dated September 16,

---

[86] The first, second, fourth, seventh, tenth, eleventh, twelfth, thirteenth and fourteenth causes of action of County's cross-action each address one of the nine contracts.

1999, CSDLAC stated: "The first three-year extension was granted and will expire on November 8, 2000. Due to the current uncertain situation involving proposed ordinances in the County of Kern, which may place restrictions on the land application of biosolids, [CSDLAC's] preference is to extend the contract through the second allowable three-year period. It is our understanding that Yakima is interested and will participate in this arrangement at the original biosolids management fee of $25.00 per wet ton."

Yakima agreed to the second extension by countersigning the letter and, as a result, the termination date of the extended contract became November 8, 2003.

### a. *Previous CEQA review and documentation*

CSDLAC's final program EIR for the "Joint Outfall System 2010 Master Facilities Plan, June 1995" (1995 final Program EIR), discussed the Yakima Agreement: "Since circulation of the draft EIR, some changes in the reuse sites have occurred. . . . Ag Tech has opened an additional land application site near Delano, California, that now receives some of the Districts' biosolids. The Districts also have initiated new land application contracts with the Yakima Company near Buttonwillow, California; McCarthy Family Farms near Corcoran, California; and one short-term contract with Bio Gro Systems near Blythe, California." The 1995 final Program EIR also stated that in January 1995, approximately 1,699 wet tons per week were delivered to McCarthy Family Farms and 580 wet tons per week were delivered to Yakima Company.

CSDLAC's draft Program EIR recognized that NOx emissions generated by trucks transporting biosolids from the Carson Plant to disposal or use sites would be considered a significant impact under the thresholds adopted by the South Coast Air Basin and the Southeast Desert Air Basin. To mitigate this impact, CSDLAC stated it would perform maintenance on its trucks at least as frequently as recommended by the manufacturer.

The 1995 final Program EIR also references the mitigated negative declarations from the Central Valley Water Board obtained by McCarthy Family Farms and Yakima Company in connection with the permits that authorize them to land apply biosolids. More specifically, the Central Valley Water Board adopted resolution No. 95-011 approving the initial study and adopting a mitigated negative declaration for the issuance of a WDR relating to Yakima Company's application of biosolids to 1,372 acres of farmland in Kern County.

Based on the 1995 final Program EIR and the mitigated negative declaration of the Central Valley Water Board, CSDLAC contends that both the

hauling and the land application aspects of the extension of the Yakima Agreement were covered by CEQA documents and that further CEQA review was unnecessary. In contrast, County argues that CSDLAC violated CEQA by (1) approving the extension of the Yakima Agreement without performing the review required by Guidelines section 15168 and (2) failing to prepare a subsequent or supplemental EIR that analyzed the extension.

### b. *Mootness*

In responding to our inquiry, both parties have agreed that the November 8, 2003, termination date rendered County's CEQA challenge to the extension of the Yakima Agreement moot. (See *Giles v. Horn* (2002) 100 Cal.App.4th 206 [123 Cal.Rptr.2d 735] [challenges to county contracts moot because contracts had been fully performed and had expired].) County, however, asserts that we should exercise our discretion to address the controversy because of its importance and the likelihood similar controversies will recur. We also conclude the challenge to the Yakima Agreement is moot. Furthermore, we decline County's invitation to render an advisory opinion because the future disputes between County and CSDLAC regarding CSDLAC's disposal activities are likely to be factually distinct. Thus, any ruling made now would do little to prevent future disputes from arising.

### 2. *CLABS Contract No. C-87685*

In January 1994, CLABS entered contract No. C-87685 (Contract C-87685) with Gardner-Arciero for the loading, transporting and beneficial use of biosolids produced by CLABS. Gardner-Arciero applied the biosolids to farms near Cantil, California. On February 11, 2000, the Los Angeles City Council approved amendment No. 3 to Contract C-87685, which included an extension of the contract through February 14, 2003. The second cause of action in County's cross-action alleged CLABS violated CEQA by failing to perform any environmental review before approving the amendment of Contract C-87685. The superior court rejected the second cause of action and ruled (1) the Central Valley Water Board, not CLABS, was the lead agency for the project, (2) the contract had been reviewed under a program EIR prepared by CLABS, and (3) the amendment did not expand the project in a way that required additional review under CEQA.

The date for the expiration of the amendment to Contract C-87685 has passed, but County asserts its CEQA claim regarding the amendment of Contract C-87685 is not moot unless that contract cannot be renewed or extended.

As with the CSDLAC-Yakima Agreement, we conclude that County's CEQA challenges to CLABS's February 11, 2000, approval of amendment

No. 3 to Contract C-87685 is moot because the contract is no longer in effect. (See *Giles v. Horn, supra,* 100 Cal.App.4th 206.) Moreover, the mere prospect that Contract C-87685 or a similar contract might become operative because of future actions taken by CSDLAC and Gardner-Arciero does not create an actual, present controversy.

### 3. *CLABS Contract No. C-94375*

In October 1996, CLABS entered contract No. C-94375 (Contract C-94375) with RBM and Valley Communities, Inc. (collectively, RBM-Valley) for the loading, transporting and beneficial use of biosolids produced at the Terminal Island and Hyperion treatment plants. RBM-Valley agreed to load CLABS's biosolids onto its trucks, transport the biosolids to RBM-Valley's sites, unload the biosolids at designated sites, and beneficially use the biosolids in accordance with applicable laws and regulations. The term of Contract C-94375 was to run for three years from the date of the first load.

On October 26, 1999, the Los Angeles City Council approved an amendment of Contract C-94375 to provide CLABS the option of renewing it for two additional three-year terms, the first of which would be from October 31, 1999, through October 30, 2002. The first cause of action in County's cross-action alleged the extension of Contract C-94375 was a project for purposes of CEQA, and CLABS violated CEQA by failing to perform any environmental review before approving the extension. The superior court rejected this claim, ruling the extension already had been reviewed under a program EIR adopted by CLABS and further review was not required.

In its supplemental letter brief, CLABS represented that Contract C-94375 was amended again in 2000 and that the contract, as then amended, remains in effect. RBM[87] and CLABS assert that performing CEQA review at this point, such as preparing an EIR or the checklist referenced in Guidelines section 15168, subdivision (c)(4), would be pointless because the particular amendment to Contract C-94375 challenged in the cross-action is no longer in effect. In contrast, County contends that its CEQA claim regarding Contract C-94375 is not moot because the contract has remained in effect as a result of the subsequent amendment in 2000.

We conclude that County's cause of action based on Contract C-94375 is not moot. First, a court order addressing Contract C-94375 may still be able to provide effective relief. For example, if an environmental assessment actually is performed by CLABS, such assessment could lead to mitigation

---

[87] RBM also submitted a supplemental letter brief and requested that we consider it. That request is granted.

measures, either as part of a supplemental EIR or a subsequent mitigated negative declaration, that affect the performance of Contract C-94375. (See *Association for a Cleaner Environment v. Yosemite Community College Dist.*, *supra*, 116 Cal.App.4th at p. 641 [CEQA claim not moot because performing initial study could lead to adoption of mitigation measures].) Second, Contract C-94375 itself is still in effect and the case law regarding the mootness of contract-based claims involves the expiration of the entire contract, not just the expiration of a single amendment. (See *Giles v. Horn, supra*, 100 Cal.App.4th at pp. 228–229.)

### 4. *OCSD's contract with Yakima*

OCSD and Yakima entered into a contract titled "Agreement for the Management of Biosolids and Construction and Operation of Storage/Composting Facility," effective January 10, 2000 (OCSD-Yakima Agreement). Under section 1 of the OCSD-Yakima Agreement, Yakima charged $25 per wet ton "to accept delivery of up to 100 wet tons per day of Class B Biosolids" from OCSD's plants and apply the biosolids to land at specified sites in Kern County. Yakima represented that it had valid permits from the Central Valley Water Board and Kern County Environmental Health Services Department that authorized it to land apply biosolids at the sites.

The OCSD-Yakima Agreement also contained a number of provisions regarding the construction and operation of a storage and composting facility. In July 2000, however, OCSD and Yakima amended the OCSD-Yakima Agreement to remove any reference to the construction or operation of a storage and composting facility. The trial court ruled County's CEQA challenge to the storage and composting facility was moot. We concur in that ruling.

The remaining part of the OCSD-Yakima Agreement, which concerns the land application of Class B biosolids to sites located in Kern County, was not formally terminated and technically remains in effect. Section 21.1 of the OCSD-Yakima Agreement stated that the term of the agreement would end in January 2012, unless terminated earlier. Section 23.1 of the OCSD-Yakima Agreement stated Yakima could terminate the agreement on 24 hours' notice if it could no longer legally perform the required services. OCSD contends the adoption of the heightened treatment standards had the effect of terminating the agreement by making the land application of Class B biosolids illegal.

County asserts the CEQA claim in its thirteenth cause of action is not moot because OCSD and Yakima could resume activities under the OCSD-Yakima Agreement if the heightened treatment standards were invalidated or modified.[88] Even assuming the claim presently is moot, we will exercise our inherent discretion and consider County's CEQA claim regarding the OCSD-Yakima Agreement because of the potential it will be reinstituted if the heightened treatment standards are modified. (See *In re William M.* (1970) 3 Cal.3d 16, 23 [89 Cal.Rptr. 33, 473 P.2d 737] [court has discretion to consider issue likely to recur].)

### 5. *OCSD's contract with Magan*

OCSD and Shaen Magan entered a contract titled "Agreement for the Management of Biosolids," effective January 10, 2000 (OCSD-Magan Biosolids Agreement). Under the agreement, OCSD agreed to pay Magan a base fee of $22.40 per wet ton for biosolids that Magan accepted, transported, and used on land located in Kings and Kern Counties. The agreement was not expressly limited to Class B biosolids. The OCSD-Magan Biosolids Agreement was scheduled to terminate January 2003 and provided for early termination in the event that Magan could no longer legally perform the services required.

In its supplemental letter brief, OCSD has represented that OCSD and Magan agreed to extend the OCSD-Magan Biosolids Agreement through December 31, 2004, and it was likely that OCSD would exercise an option to extend the agreement an additional year. Because the agreement may have been extended through 2005, we will address the merits of County's challenge to OCSD's failure to perform any environmental assessment concerning the OCSD-Magan Biosolids Agreement and leave it to the superior court to determine the question of mootness on remand.

### 6. *OCSD's option contracts*

On January 10, 2000, OCSD entered three contracts involving the option to purchase real estate. One option contract was entered with Shaen Magan involving 1,360 acres and another option contract was entered with Shaen Magan, Inc., involving 2,666 acres. Also, OCSD entered an option and right of first refusal with Yakima, which had a 12-year total term and involved 320 acres.

---

[88] For example, in conducting its environmental review, County might consider alternatives to the current heightened treatment standards that would allow the application of Class B biosolids to land only used to grow fiber crops, such as cotton, or land not used for food crops and grazing. If an alternative is adopted that allows some lands to receive Class B biosolids, then deliveries might resume under the OCSD-Yakima Agreement.

The appellate record does not show whether OCSD's option agreements with Shaen Magan and Shaen Magan, Inc., which were to expire after three years, have been exercised, extended or allowed to expire. Similarly, the appellate record does not show the current status of OCSD's option and right of first refusal with Yakima. The option was to expire after three years and the right of first refusal was to remain in effect for nine years thereafter, but OCSD and Yakima may have rescinded it like the portion of the OCSD-Yakima Agreement. We will consider the merits of County's CEQA claims concerning these contracts and, on remand, the superior court can determine whether those claims are moot.

### B. *Program EIR and Subsequent Environmental Assessment*

Both CLABS and OCSD have adopted program EIR's that cover the management of biosolids generated at the treatment plants they operate.

#### 1. *EIR's of CLABS*

In connection with CLABS's wastewater treatment operations, the City of Los Angeles prepared a CEQA document titled "Offsite Sludge Transportation and Disposal Program Final EIR" dated March 1989 (CLABS 1989 FEIR). Section 3 of the CLABS 1989 FEIR is titled "Setting, Impacts, and Mitigation Measures" and excerpts are part of the appellate record.

The CLABS 1989 FEIR states that (1) the hauling and disposal of sewage sludge from the treatment plants is not one specific action, but consists of potential combinations of actions involving different disposal technologies and transportation modes; (2) a detailed discussion of current or proposed projects is not provided because site-specific issues will be dealt with on a case-by-case basis; (3) future or ongoing specific projects may require additional CEQA documentation; and (4) such additional CEQA documentation would tier off the CLABS 1989 FEIR.

More recently, the City of Los Angeles also prepared a CEQA document titled "Biosolids Management Program Final [EIR]" dated July 1996 (CLABS 1996 FEIR). The first page of its executive summary is part of the appellate record. The CLABS 1996 FEIR was designed to "serve as the basis for examining subsequent implementation actions to determine if additional environmental documentation is required." The CLABS 1996 FEIR stated that (1) under the concept of tiering, the site-specific environmental documents would incorporate by reference the analysis of environmental effects contained in the CLABS 1996 FEIR and (2) if additional effects are created or further mitigation measures are required, supplemental environmental documents would be required.

## 2. *OCSD's program EIR*

OCSD adopted a 1999 Strategic Plan that covered all aspects of its operations and assessed its wastewater systems needs and options to the year 2020. Volume 8 of OCSD's 1999 Strategic Plan addressed biosolids management. OCSD acted as the lead agency for purposes of preparing and considering the environmental documents that CEQA required for the adoption of the 1999 Strategic Plan. As a result, OCSD caused a draft program EIR, dated June 1999, to be prepared covering the 1999 Strategic Plan (OCSD 1999 DEIR). Chapter 8.0 of the OCSD 1999 DEIR was titled "Residual Solids/Biosolids Management Setting, Impacts, and Mitigations." In October 1999, after receipt of comments, the "Orange County Sanitation District 1999 Strategic Plan Final Program [EIR]" was prepared. Both the draft and final EIR are part of the administrative record.

OCSD used a program EIR to allow for more streamlined and focused environmental reviews in the future, including the use of tiering. In addition, the OCSD 1999 DEIR states that "[s]hould the design or project description as identified in this document change substantially for any of the near-term projects, subsequent project-level impact evaluation will be necessary."

## 3. *Lead agencies under the program EIR's*

 CEQA defines "lead agency" as "the public agency [that] has the principal responsibility for carrying out or approving a project [that] may have a significant effect upon the environment." (§ 21067.) If more than one public agency is involved in a project but only one public agency carries out the project, then "that agency shall be the lead agency even if the project would be located within the jurisdiction of another public agency." (Guidelines, § 15051, subd. (a); see § 21165.)

CLABS and OCSD are the agencies that actually carry out the construction and operation of wastewater treatment facilities. Thus, under the ordinary meaning of the language contained in the statutory definition of "lead agency," both CLABS and OCSD are lead agencies. This conclusion is not controversial in that CLABS and OCSD have recognized in their program EIR's that they are each the lead agency for purposes of their wastewater treatment operations.

Because the operation of a wastewater treatment facility includes managing the biosolids that the facility produces, CLABS and OCSD are also each the lead agency for their activities concerning the management of biosolids. Again, this conclusion is based on (1) a straightforward application of the statutory definition of "lead agency" and the criteria contained in the Guidelines (see

§ 21067; Guidelines, §§ 15050, 15051), and (2) the program EIR's of CLABS and OCSD, both of which cover the activity of biosolids management. Thus, the program EIR's effectively acknowledge that biosolids management is the responsibility of CLABS and OCSD, even though they carry out that responsibility by contracting with other entities to handle the physical aspects of hauling and disposing of the biosolids generated. (See § 21065, subd. (b) [definition of "project" includes activity undertaken in whole or in part through a contract with a public agency].)

### 4. *Assessment of later actions related to the program*

Having determined that CLABS and OCSD are lead agencies with program EIR's that address biosolids management, the question becomes what procedural steps those lead agencies should have performed to comply with CEQA when entering contracts or extensions concerning the use or disposal of biosolids generated at their facilities.

The program EIR's of CLABS and OCSD expressly state that activity undertaken after the adoption of the program EIR's might result in the use of a tiered EIR to achieve future CEQA compliance. Therefore, one possible answer to the question is that the lead agencies must follow the steps of performing a preliminary review, completing an initial study, and preparing a tiered EIR. (See § 21094.)

 Alternatively, section 21166 sets forth the conditions where a subsequent or supplemental EIR is required to cover a new activity that is regarded as a change in a project already covered by an existing EIR. In particular, a subsequent or supplemental EIR is required where "[s]ubstantial changes are proposed in the project [that] will require major revisions of the [EIR]." (§ 21166, subd. (a); see Guidelines, §§ 15162 [subsequent EIR], 15163 [supplement to EIR] & 15164 [addendum to EIR].)

To identify the initial procedural steps that CLABS and OCSD should have taken, we turn to the provisions in the Guidelines that explicitly address how subsequent activity that is related to the program covered by a program EIR must be handled to comply with the documentation requirements of CEQA. Section 15168 of the Guidelines provides:

"(c) Use With Later Activities. Subsequent activities in the program must be examined in the light of the program EIR to determine whether an additional environmental document must be prepared.

"(1) If a later activity would have effects that were not examined in the program EIR, a new initial study would need to be prepared leading to either an EIR or a negative declaration.

"(2) If the agency finds that pursuant to Section 15162 [regarding subsequent EIR's], no new effects could occur or no new mitigation measures would be required, the agency can approve the activity as being within the scope of the project covered by the program EIR, and no new environmental document would be required.

"(3) An agency shall incorporate feasible mitigation measures and alternatives developed in the program EIR into subsequent actions in the program.

"(4) Where the subsequent activities involve site specific operations, the agency should use a written checklist or similar device to document the evaluation of the site and the activity to determine whether the environmental effects of the operation were covered in the program EIR."

The Discussion that follows section 15168 of the Guidelines states: "Use of the program EIR also enables the Lead Agency to characterize the overall program as the project being approved at that time. Following this approach when individual activities within the program are proposed, the agency would be required to examine the individual activities to determine whether their effects were fully analyzed in the program EIR. If the activities would have no effects beyond those analyzed in the program EIR, the agency could assert that the activities are merely part of the program which had been approved earlier, and no further CEQA compliance would be required. This approach offers many possibilities for agencies to reduce their costs of CEQA compliance and still achieve high levels of environmental protection."[89]

Based on the requirements of subdivision (c) of section 15168 of the Guidelines, County argues that if CLABS's and OCSD's sludge disposal contracts are viewed as "subsequent activities" in their wastewater collection, treatment and disposal program, then CLABS and OCSD are required to conduct an examination to determine if additional environmental documents must be prepared and, with respect to site-specific activities, prepare a written checklist or similar device to determine whether the environmental effects of the contracts were covered by the program EIR.

There is little doubt that the contracts and extensions entered by CLABS and OCSD concern the management of biosolids and that CLABS and OCSD have characterized the management of biosolids as part of the overall program covered by their program EIR's. Therefore, the contracts and extensions are "[s]ubsequent activities in the program" for purposes of Guidelines section 15168, subdivision (c). Consequently, CLABS and OCSD

---

[89] The Discussion is available at <http://ceres.ca.gov/topic/env_law/ceqa/guidelines/art11.html> (as of Apr. 1, 2005).

were required to conduct the examination and make the determinations required by that subdivision.[90]

The required examination and determinations were not made. Neither CLABS nor OCSD has cited to any evidence in the administrative record showing it completed these requirements. With respect to some of OCSD's contracts, the administrative record affirmatively shows such an examination was overlooked. One staff report sent to the board of directors of the OCSD on November 17, 1999, concerning the OCSD's consideration of the OCSD-Yakima Agreement and the OCSD-Magan Biosolids Agreement, contained no entries under the heading "CEQA FINDINGS." Similarly, another staff report that recommended authorizing the staff to negotiate with Magan for the purchase of a site for the long-term management of OCSD's biosolids contained only the notation "N/A" under the heading "CEQA FINDINGS."

As a result of their failure to conduct an examination and document the determinations required to be made after the examination, CLABS and OCSD violated section 15168, subdivision (c) of the Guidelines. Accordingly, they have "not proceeded in a manner required by law" and have abused their discretion for purposes of section 21168.5.[91]

C. *Remand and Remedy*

To remedy the foregoing violations of CEQA and appropriately dispose of the moot causes of action in County's cross-action, the judgment on the cross-action will be reversed and the superior court directed to dismiss the moot causes of action (see *Giles v. Horn, supra,* 100 Cal.App.4th at p. 229 [when an appeal is moot, the preferable procedure is to reverse the judgment and direct the trial court to dismiss the action for having become moot prior to its final determination on appeal]), and issue a writ of mandate under the remaining causes of action.

We have determined that dismissals of the second cause of action concerning Contract C-87685 between CLABS and Gardner-Arciero, and the seventh cause of action concerning the CSDLAC-Yakima Agreement are appropriate because of mootness. Additional causes of action in the cross-action may be moot at the time the superior court issues a writ of mandate. For instance, if Yakima and OCSD formally terminate the OCSD-Yakima Agreement, then the thirteenth cause of action would be moot and should be dismissed rather

---

[90] We do not address what impact, if any, the provisions of section 15004 of the Guidelines might have on the steps taken to comply with CEQA after the examination and determinations required by subdivision (c) of section 15168 of the Guidelines have been made.

[91] We will not go so far as to rule what determinations should have been made, but remand to allow CLABS and OCSD to make those determinations in the first instance.

than included in the writ. Similarly, if any option agreement has expired unexercised or has been formally terminated, then the related cause of action would be moot. Consequently, immediately prior to issuing a writ of mandate, the superior court should determine which causes of action are moot and exclude them from the writ or writs issued.

If all of the remaining causes of action are justiciable, the superior court should issue a writ of mandate under the first and fourth causes of action of the cross-action[92] directing CLABS to undertake the examination required by section 15168, subdivision (c) of the Guidelines as well as the other steps necessary to comply with that provision and any other provisions of CEQA or the Guidelines that become applicable as a result of the determinations made under section 15168, subdivision (c) of the Guidelines. A similar writ of mandate should be issued under the remaining causes of action that concern OCSD[93] and are justiciable. The superior court also shall require a return be filed to notify it of (1) the determinations made under Guidelines section 15168, subdivision (c), and (2) the other actions taken by the sanitation agency in response to the writ of mandate. (See § 21168.9, subd. (b) [trial court shall retain jurisdiction by way of a return]; Cal. Civil Writ Practice (Cont.Ed.Bar 3d ed. 2004) § 11.1 & appen. A-15, pp. 473–474, 581–582.)

The question of whether any acts taken in performance of the contracts should be enjoined should, if raised by the parties on remand, be determined by the superior court in accordance with section 21168.9 and any other applicable provisions of law.

VIII. *Evidentiary Objections*

In connection with the non-CEQA causes of action, plaintiffs contend the superior court erred in failing to permit them to conduct discovery or submit extra-record evidence at the time of trial. Because plaintiffs' cause of action concerning the biosolids impact fee will be remanded for further proceedings, the assertions of reversible error based on the evidentiary rulings related to that cause of action need not be addressed.

---

[92] The first cause of action concerns Contract C-94375 and the fourth cause of action concerns the "Contract to Purchase Real Property" that the City of Los Angeles entered with Valley Communities, Inc., and Buena Vista Lake Properties regarding 4,688 acres of land located in Kern County at a purchase price of approximately $9.6 million. The contract to purchase real property was not discussed in part VII.A., *ante*, because it was performed and did not expire. Accordingly, the CEQA cause of action relating to that contract is not moot.

[93] These causes of action are the tenth (OCSD-Magan Biosolids Agreement), eleventh (option agreement to purchase real estate from Magan), twelfth (option agreement to purchase real estate from Shaen Magan, Inc.), thirteenth (OCSD-Yakima Agreement) and fourteenth (option agreement to purchase real estate from Yakima) contained in County's cross-action.

To the extent that the evidentiary issues relate to plaintiffs' allegations that counsel for County advised the Kern County Board of Supervisors that it only had to consider the proposed ordinance's impacts within Kern County and had no duty to consider the impacts to the surrounding communities, those evidentiary issues are no longer relevant because of the broader environmental review that will be conducted in connection with the preparation of an EIR. For the same reason that we did not address the issues concerning the claim based on California's constitutional limits on exercises of the police power (see part V., *ante*), we need not address the related evidentiary issues.

Insofar as the evidentiary issues might relate to the other alleged constitutional violations, such as the claims based on the commerce clause and equal protection, or the affirmative defenses of laches, unclean hands and estoppel, we conclude the evidentiary rulings of the superior court did not affect the outcome on those claims and defenses, and thus were not reversible error.

## DISPOSITION

*Appeal*

The judgment entered on plaintiffs' petition and complaint is reversed and the matter is remanded to the superior court. The orders underlying the judgment are reversed in part and affirmed in part as set forth *post*.

As to plaintiffs' first cause of action, the superior court is directed to vacate its November 22, 2000, order denying that cause of action under CEQA. The superior court is further directed to issue a writ of mandate ordering County to void its negative declaration relating to Ordinance G-6638 and to prepare an EIR that covers the adoption of an ordinance regulating the land application of treated sewage sludge within its jurisdiction. The heightened treatment standards once reflected in Kern County Ordinance Code provision 8.05.040(A), Ordinance G-6638, and now set forth in Ordinance No. G-6931, may remain operative, provided that County prepares, in good faith without unnecessary delay, an EIR that complies with CEQA.

As to plaintiffs' second cause of action, the November 25, 2002, order denying relief is affirmed.

As to plaintiffs' third cause of action regarding the validity of the biosolids impact fee, the superior court is directed to vacate its November 25, 2002, order denying relief under that cause of action. On remand, the superior court is directed to uphold the biosolids impact fee to the extent that the funds generated are, or will be, applied to valid purposes and those purposes are

otherwise severable from the invalid ones. The superior court also is directed to hold such further proceedings as it deems appropriate for the purpose of determining how the funds generated by the biosolids impact fee were spent, or will be spent, and how to separate the valid applications of funds, if any, from the invalid applications.

*Cross-action*

The judgment on County's cross-action is reversed and the matter remanded to the superior court with directions to (1) enter an order dismissing the second and seventh causes of action as moot; (2) determine which of the remaining causes of action in the cross-action (first, fourth, tenth, eleventh, twelfth, thirteenth and fourteenth causes of action) have become moot and dismiss those causes of action; (3) issue a writ of mandate under the causes of action that are not moot directing CLABS or OCSD to undertake (a) the examination and make the determinations necessary to comply with section 15168, subdivision (c) of the Guidelines and (b) the steps necessary to comply with any other provisions of CEQA or the Guidelines that become applicable as a result of the determinations made under Guidelines section 15168; and (4) require the party subject to the writ of mandate to file a return.

The parties shall bear their own costs on the appeals.

Dibiaso, Acting P. J., and Vartabedian, J., concurred.

A petition for a rehearing was denied April 25, 2005.